McLEODUSA
TELECOMMUNICATIONS SERVICES,
INC., Plaintiff,

Office of Consumer Advocate,
Intervenor Plaintiff,

v.

IOWA UTILITIES BOARD, Utilities Division, Department of Commerce; John Norris and Curtis Stamp, in their Official Capacities as Members of the Iowa Utilities Board and not as Individuals; and Qwest Corporation, Defendants.

No. 4:07–cv–214.

United States District Court,
S.D. Iowa,
Central Division.

May 6, 2008.

David Jay Lynch, Iowa Utilities Board Dept of Commerce, Des Moines, IA, Lisa A. Anderl, Qwest Corporation, Seattle, WA, Timothy Goodwin, Qwest Corporation, Denver, CO, David S. Sather, Littleton, CO, for Defendant/Intervenor Defendant.

Bret Alan Dublinske, Dickinson Mackaman Tyler & Hagen PC, Des Moines, IA, for Plaintiff.

Gary D. Stewart, IA Dept of Justice Special Litigation Division, Des Moines, IA, for Intervenor Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

### I. PROCEDURAL BACKGROUND

On May 16, 2007, Plaintiff, McLeodUSA Telecommunications Services, Inc. ("McLeod") filed a Complaint for Declaratory and Injunctive Relief (Clerk's No. 1) against Defendants, the Iowa Utilities Board, Utilities Division, Department of Commerce ("IUB"), John Norris and Curtis Stamp, in their official capacities as members of the IUB ("Norris" and "Stamp"), and Qwest Corporation ("Qwest") (collectively "Defendants"). In the Complaint, McLeod alleges that Qwest provided it access to electrical power on terms and conditions that are discriminatory, in violation of the Telecommunications Act of 1934, 47 U.S.C. § 151 et seq. ("the 1934 Act"), as amended by the Telecommunications Act of 1996 ("the 1996 Act"), 47 U.S.C. § 251 et seq. McLeod claims that it complained of Qwest's discrimination to the IUB and that the IUB, in issuing an administrative order on the issue, failed to enforce Federal and State laws plainly prohibiting such discrimination.

The IUB, Norris, and Stamp filed an Answer to the Complaint on July 13, 2007. Clerk's No. 7. Qwest filed an Answer to the Complaint on July 23, 2007. Clerk's No. 8. On July 26, 2007, the Iowa Office of Consumer Advocate ("OCA") moved for permissive intervention, pursuant to Federal Rule of Civil Procedure 24. Clerk's No. 9. The Court granted the OCA's intervention request (Clerk's No. 10), and the OCA's Intervenor Complaint, asserting claims substantially parallel to those of McLeod, was filed on July 31, 2007. Clerk's No. 11. The IUB, Norris, and Stamp filed an Answer to the Intervenor Complaint on August 15, 2007. Clerk's No. 12. Qwest filed an Answer to the Intervenor Complaint on August 17, 2007. Clerk's No. 13. The parties stipulated to having the case resolved by the Court on the basis of the existing administrative record. *See* Clerk's No. 14. Accordingly, the Court entered an order setting a briefing schedule on September 11, 2007. Clerk's No. 15. The OCA and McLeod filed trial briefs on October 23, 2007. Clerk's Nos. 16, 18. The IUB and Qwest filed trial briefs on November 20, 2007. Clerk's Nos. 19, 20. The OCA and McLeod filed reply briefs on December 11, 2007. Clerk's Nos. 22, 23. A hearing was held on January 11, 2008. Clerks's No. 29. The matter is fully submitted.

### II. FACTUAL BACKGROUND

Congress enacted the Telecommunications Act of 1996 in an effort to enhance competition in the local telephone service market. *See AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The purpose and effect of the 1996 Act was summarized well by the Eighth Circuit Court of Appeals in 2004:

> Even after the 1980s breakup of the AT & T telecommunications monopoly, which, *inter alia*, divested AT & T of its local exchange carriers, local telephone service continued to be viewed and operated as a natural monopoly, with state utility boards, or commissions, giving one local telephone service provider exclusive coverage of a given geographic area. The Telecommunications Act of 1996 (1996 Act), 47 U.S.C. §§ 151–615b, fundamentally restructured local telephone markets and the regulatory scheme that governed them. No longer could states enforce laws that impeded competition in the local markets. No longer was the local market to be viewed as a natural monopoly with only one authorized provider of local telephone service. To the contrary, the 1996 Act

required local exchange carriers to facilitate local competition by sharing their networks with their new competitors. The 1996 Act also thrust the federal government into the local telephone market regulatory arena, which had previously been the exclusive domain of the states. *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 497 (3d Cir.2001) ("The Act requires that local service, which was previously operated as a monopoly overseen by the several states, be opened to competition according to standards established by federal law."), *cert. denied*, 537 U.S. 941, 123 S.Ct. 340, 154 L.Ed.2d 247 [(2002)].

*Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683, 685–86 (8th Cir.2004).

To facilitate competition, the 1996 Act imposed several duties on incumbent local exchange carriers ("ILECs")[1] with regard to new competitors in the telecommunications market, or competitive local exchange carriers ("CLECs").[2] First, ILECs must permit any requesting CLEC to interconnect with the ILEC's existing network. 47 U.S.C. § 251(c)(2). Second, ILECs must provide CLECs with access to unbundled network elements ("UNEs"), that is, "access to network elements on an unbundled basis at any technically feasible point"[3] on "just, reasonable, and nondiscriminatory" terms. *Id.* § 251(c)(3). Finally, ILECs must offer any telecommunications services it provides to CLECs at wholesale rates, so that CLECs may offer such services for resale to end-users. *Id.* § 251(c)(4).

According to McLeod, CLECs that deploy at least a portion of their own network facilities used in combination with UNEs are known as "facilities-based" CLECs:

> When facilities-based CLECs like McLeodUSA entered the picture, the networks of these new competitors had to be interconnected to the existing networks of the ILECs. Interconnection allows, among other things, access to the UNEs that would permit the CLEC to reach end users over the ILEC's existing aerial or buried wires, which, when leased by a CLEC, are called "UNE loops." This interconnection of networks, provided for under federal and state law, is typically accomplished by

1. A "local exchange carrier," as defined by the 1996 Act is "any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(26). An "incumbent local exchange carrier" is defined, with respect to an area, as "the local exchange carrier that on February 8, 1996, provided telephone exchange service in such an area; and on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to ... the Commission's regulations," or the successor or assign of such entity. 47 U.S.C. § 251(h)(1). Qwest is an incumbent local exchange carrier, or "ILEC" within the meaning of the 1996 Act.

2. McLeod is a CLEC, within the meaning of the 1996 Act.

3. The term "network element" is defined as "a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." 47 U.S.C. § 153(29). Section 251(d)(2) provides the standard to be used in determining which network elements must be unbundled for purposes of § 251(c)(3). *See* 47 U.S.C. § 251(d)(2) (providing that the decision of what network elements must be unbundled must consider, at a minimum, whether "access to such network elements as are proprietary in nature is necessary; and the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer").

McLeodUSA locating its equipment in a Qwest central office ("CO") through a process called "collocation."

Qwest charges McLeod a variety of fees for collating McLeodUSA's equipment in Qwest COs. For example, if a CLEC requests a "caged" area to house its network equipment, then Qwest will erect a fenced off area in its CO to create the "caged collocation" space that is then leased by the competitive provider. The competitive LEC also requires power to run its "collocated equipment." A CLEC orders power feeder cables that run from the CO power plant to the CLEC's collocation site, for which the CLEC pays the ILEC a non-recurring charge to purchase and install these cables.... Each Qwest central office has a power plant that serves both Qwest and all collocated entities.

Compl. at 2–3.

"Upon receiving a request for interconnection, services, or network elements" from a CLEC, an ILEC "may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers...." 47 U.S.C. § 252(a). Any such voluntarily negotiated interconnection agreement ("ICA") must "include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement." *Id.* The ICA must then be submitted to the relevant State commission (in Iowa, the IUB) for approval. *Id.* § 252(a), (e). If a voluntary ICA cannot be reached, the parties may petition the State commission for arbitration of the matter. *Id.* § 252(b). A third alternative for an ILEC and a CLEC to enter into an ICA is for the CLEC to essentially "opt-in" to an ICA that the ILEC has with another CLEC. *See id.*

§ 252(i) ("A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.")

McLeod elected this third alternative in entering into an ICA with Qwest. The IUB approved the ICA between McLeod and Qwest on December 15, 1997. McLeod and Qwest's ICA provided that the interconnections services provided to McLeod by Qwest would be at rates in accordance with the Statement of Generally Available Terms ("SGAT") on file with the IUB.[4] In June 2001, Qwest filed proposed changes to its SGAT with the IUB, including new rates and a new rate structure for providing DC power for collocation. *See* IUB Docket No. RPU–01–6, Proposed Decision and Order (Mar. 25, 2002), *available at* www.state.ia.us/government/com/util/docs/.0orders/2002/0325_rpu016.pdf (Qwest "filed proposed wholesale prices for services and new unbundled network elements"). While some of Qwest's proposed rates were contested, others, including the new rates and rate structure for DC power for collocation were not contested and were, therefore, ultimately approved by the IUB in 2002. *See* Proposed Decision and Order at 38 ("Qwest has proposed prices for many other UNEs and services in this docket that were not set in Docket No. RPU–96–9. The proposed prices are uncontested, are supported by Qwest studies, and will be approved subject to complaint or investigation.").

---

**4.** Qwest, as a "Regional Bell Operating Company" ("RBOC") is authorized to offer interconnection services to CLECs pursuant to the terms of an SGAT. *See* 47 U.S.C.

§ 271(c)(1)(B). The rates available pursuant to an SGAT are set forth in tariffs which are approved by, and which are on file with, the state agency.

On August 18, 2004, McLeod and Qwest entered into a "DC Power Measuring Amendment" (the "Amendment") to the ICA, which altered some terms of the original ICA between the parties. At some point after entering into the Amendment, a dispute developed between McLeod and Qwest over the manner in which Qwest was charging McLeod for the DC power used for collocation, specifically the "power plant" charge.[5] McLeod initially withheld amounts it believed were overcharges, but ultimately paid Qwest the full amount billed, reserving its right to challenge the charges for collocation power in a regulatory proceeding before the IUB.

On February 9, 2006, McLeod filed a complaint against Qwest with the IUB, alleging that Qwest was overcharging for collocation power charges in violation of the amended ICA, Iowa law, and the 1996 Act.[6] Specifically, McLeod claimed that Qwest was billing it collocation power plant charges on the basis of power "ordered," rather than on the basis of actual usage. McLeod claimed that Qwest's practices in this regard violated Iowa Code §§ 476.100(2),[7] 476.100(3),[8] 476.100(5),[9] 476.100(7),[10] and 47 U.S.C §§ 201(b)[11] and

5. There are two components, or "rate elements" for power that Qwest charges CLECs, a "power usage" component and a "power plant" component. The dispute between the parties relates only to the "power plant" component. Counsel for McLeod explained the distinction between the two rate elements at the hearing:

The electrical utility, like MidAmerican Energy, supplies all terminating current or AC power. As a result, every central office has equipment that converts the AC power to DC power, and these and battery backups to continue operation in the event of an outage. The equipment that performs this, rectifiers or chargers, batteries, and controllers is collectively called the DC power plant.
Each central office has a power plant which is a shared indivisible resource used by Qwest and any other carrier collocating and the DC power is distributed from this single power plant out to individual power users by distribution cables. A CLEC orders its own separate distribution or feeder cables from the ILEC that run from the power plant to the particular place that that CLEC is located. And it pays the ILEC a charge to purchase and install those cables. McLeod and other CLECs are also charged for the power used to operate their equipment, not unlike the electric bill that one might receive at home. The charges to McLeodUSA for use of the shared power resource are in two parts: A charge for power usage [the "power usage" component] and a charge for a share of this shared power plant [the "power plant" component].

Hr'g Tr. at 7–8 (reference is to Court's unedited RealTime transcript).

6. McLeod's complaint also alleged that Qwest's rate per amp for collocation power was excessive. The IUB dismissed that claim on March 6, 2006. McLeod is not objecting to the IUB's ruling in regard to the excessive rate claim in the present proceedings.

7. Iowa Code § 476.100(2) provides that a local exchange carrier shall not "[d]iscriminate against another provider of communications services by refusing or delaying access to essential facilities on terms and conditions no less favorable than those the local exchange carrier provides to itself and its affiliates."

8. Iowa Code § 476.100(3) provides that a local exchange carrier shall not "[d]egrade the quality of access or service provided to another provider of communications services."

9. Iowa Code § 476.100(5) provides that a local exchange carrier shall not "[u]nreasonably refuse or delay interconnections or provide inferior interconnections to another provider."

10. Iowa Code § 476.100(7) provides that a local exchange carrier shall not "[d]iscriminate in favor of itself or an affiliate in the provision and pricing of, or extension of credit for, any telephone service."

11. 47 U.S.C. § 201(b) provides, in part, that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and rea-

251(c)(2)(D).[12] McLeod filed its complaint under the auspices of Iowa Code § 476.101(8), which required the IUB to "render a decision in the proceeding within ninety days after the date the written complaint was filed." On April 5, 2006, however, the IUB granted a joint request of McLeod and Qwest to modify the procedural schedule. The IUB held a hearing on McLeod's claim on May 10–12, 2006. The OCA participated in the hearing before the Board and all parties filed briefs and participated in oral argument on June 15, 2006.

In the filings before the IUB, McLeod and the OCA argued primarily that the case "is first and foremost about a contract: the DC Power Measuring Amendment," asserting that the Amendment required Qwest to bill for DC power plant on the basis of "actual" usage rather than on an "as ordered" basis. Jt. App., Tab 7, at 2–3 (McLeod's post-hearing brief). McLeod also argued that the fact that Qwest billed CLECs for power in a way different from the way it "billed"[13] itself amounted to discrimination and unjust and unreasonable treatment under both the 1996 Act and under Iowa law, emphasizing that the prohibition against discrimination in those statutes is unqualified and absolute. *Id.* at 26.

On July 27, 2006, the IUB issued a written Final Order. With regard to McLeod's claim that the Amendment to the ICA clearly mandated that Qwest bill DC power plant charges on the basis of actual usage, the IUB summarized the issue as follows:

> McLeodUSA suggests the pertinent language upon which this disagreement is based is contained in "Attachment 1: DC Power Measuring" to the Amendment. The Amendment provides that if a [CLEC] orders more than sixty (60) amps of power, it will be placed on the power board and Qwest will monitor power usage on a semiannual basis when requested to do so by the CLEC. The Amendment also provides that "[b]ased on these readings, if CLEC is utilizing less than the ordered amount of power, Qwest will reduce the monthly usage rate to CLEC's actual use."

McLeodUSA further argues that Section 2.2.1 of Attachment 1, states Qwest is initially to bill "–48 Volt DC Power Usage Charge" based on the quantity ordered. However, Section 2.2.1 goes on to state that for the "–48 Volt DC Power Usage Charge," Qwest will determine the actual usage at the power board as described in Section 1.2. Section 1.2 provides that once Qwest receives a request from a CLEC to monitor the power usage, it will bill the actual power usage rate from the date of the CLEC

---

sonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful."

**12.** The IUB filings repeatedly note that McLeod asserted that Qwest's actions violated 47 U.S.C. § 251(c)(3)(D). *See, e.g.,* McLeod & OCA's Jt. App. (hereinafter "Jt. App.") at Tabs 1–2. There is no such subsection to the statute, however, and it is clear from other filings that McLeod's assertion was that Qwest was in violation of 47 U.S.C. § 25 1(c)(2)(D), which provides that ILECs have the "duty to provide, for the facilities and equipment of any requesting telecommunications carrier,

interconnection with the local exchange carrier's network ... on rates, terms and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title."

**13.** As Qwest has pointed out, because it owns the power equipment at issue, it does not actually "bill" itself for power plant charges. It does, however, "allocate" power plant charges to itself in essentially the same manner that it bills CLECs for power plant charges.

monitoring request until the next reading.

There is no dispute that McLeodUSA made a valid monitoring request, nor that Qwest appropriately monitored power usage at the McLeodUSA collocations at which 60 amps had originally been ordered.

The dispute arises because Qwest, in billing McLeodUSA, billed one "–48 Volt DC Power Usage" rate element (Power Usage More Than 60 amps) at the lower usage measurement, but believes the Amendment did not change responsibility for the second "–48 Volt DC Power Usage" rate element (Power Plant). It continued to bill McLeodUSA for that rate element based on quantity ordered. This resulted in higher bills to McLeodUSA than it believes it is responsible for under the Amendment.

Jt. App., Tab 2, at 4–5. Thus, McLeod was essentially arguing that the Amendment was intended to apply to both the "per amp" and the "power plant" rate elements, whereas Qwest urged that the "actual usage" amendment language only applied to the "per amp" rate element, and not to the "Power Plant" rate element.

After reviewing the parties' arguments, the IUB found the language of the Amendment ambiguous:

> The terminology of the Amendment does not precisely match the terms used in the pricing pages, creating ambiguity. Indeed, the very fact that either party's interpretation is sustainable leads to the conclusion that the language is not clear on its face and the Board must therefore look to other evidence in the record to determine the proper interpretation of the Amendment.

Jt. App., Tab 2, at 6–7 (IUB Final Order). Turning to extrinsic evidence that each party had presented in support of its position, the IUB found that "the majority of the evidence presented supports Qwest's position that the Amendment was only intended to apply to the DC Power Usage Charge and that the DC Power Plant charge was to continue to be billed based on the amount of power ordered." *Id.* Tab 2, at 9.[14]

The IUB next considered whether Qwest discriminated against McLeod by offering services on terms and conditions that were less favorable than those Qwest provided to itself. At no time in its Final Order did the IUB address, or even mention, the provision of federal law, 47 U.S.C. § 251(c) that McLeod asserted Qwest was violating. Rather, the IUB focused exclusively on Iowa Code § 476.100. McLeod's position in regard to both the federal and the state statute was well summarized by the IUB, despite the lack of specific reference to the federal statute:

> DC power plant is designed to provide sufficient power to accommodate the peak requirements of all DC-powered telecommunications equipment in a central office, including Qwest equipment and all CLEC equipment, where peak usage is measured by the busy day/busy hour for the central office. Qwest's engineering standards for DC power plant equipment state the criteria to be used when sizing the equipment to serve the maximum power draw that occurs on the busy day/busy hour. This maximum

---

**14.** Specifically, the IUB found the following extrinsic evidence compelling: 1) the fact that McLeod did not protest the billing for Power Plant charges for approximately six months following the first power measurement pursuant to the Amendment; 2) Qwest's presentation of a McLeod internal Excel spreadsheet that tended to indicate that McLeod did not contemplate the savings on the power plant element that it was asserting the Amendment was designed to offer; and 3) the IUB's finding that McLeod's only evidence in support of its interpretation of the Amendment was the language of the Amendment itself.

power draw is referred to as the "List 1 Drain." Qwest confirmed that it sizes its power plant to meet the List 1 Drain or an approximation of it by sizing the power plant at 40 to 70 percent of "List 2 Drain."

The List 2 Drain is the total current the equipment will draw in a worst-case scenario. According to Qwest's engineering documents, the List 2 Drain is used for sizing the feeder cables, circuit breakers, fuses, and other components that make up the DC Power distribution system.

McLeodUSA points out that Qwest bills McLeodUSA for DC power plant based on the size of the delivery cables McLeodUSA orders when it establishes collocation. This equates to being charged based on List 2 Drain for power plant that has been sized, purchased, and installed based on List 1 Drain. McLeodUSA argues that this allows Qwest to overcharge McLeodUSA and all other CLECs.

McLeodUSA argues that Qwest's practice of billing CLECs for power plant based on the amount of power ordered is discriminatory because it charges CLECs for additional investment in power plant when none is actually incurred and because Qwest imputes to itself only the costs of power consumed. Thus, McLeodUSA argues, Qwest is offering this service to CLECs on terms less favorable than it provides to itself.

Jt. App., Tab 2 at 12–13. Qwest maintained, in countenance to McLeod's position, that McLeod was attacking Qwest's practice of charging the power plant rate on an "as ordered" basis, and that the IUB had already addressed the discrimination claim through its dismissal of McLeod's excessive rate claim. *Id.* at 13. The IUB rejected this position, finding that its dismissal of the excessive rate claim did not prevent it from examining the "manner in which Qwest engineers and allocates cost for power plant." *Id.* Indeed, the IUB noted that, though Qwest charges power plant costs on an "as ordered" basis, "[i]t appears that Qwest has not expended capital on power capacity augmentation that would equate to McLeodUSA power ordered." *Id.* The IUB went on:

Typically, an order for power from an individual CLEC does not require additional investment in power plant facilities. Instead, it is the total power consumption by Qwest and all the CLECs that would trigger the need for additional power plant facilities. As a result, the sum of the total power ordered is typically greater than the total of the power plant available. However, Qwest charges each CLEC on the basis of the power ordered.

Because Qwest is assessing the power plant based on the number of amps included in a CLEC's original order for power delivery cables, the CLECs may be subsidizing Qwest and thereby reducing Qwest's cost of providing service to its own end users. Moreover, Qwest admits that it assigns Power Plant costs to itself based on List 1 Drain (which approximates its actual use), but charges CLECs based on the amount of power ordered (which approximates List 2 Drain).

The available evidence indicates a valid concern exists regarding possible discrimination, but the record has not been fully developed on this issue. Although it is clear that Qwest treats CLECs differently in this respect, it is not so clear whether there is a reasonable basis for this difference or that the resulting difference is significant. The issue was not well developed in the prefiled testimony; instead, it evolved as the hearing progressed. As a result, it is not clear what, if any, steps the Board should take to remedy the situation, if a remedy is required.

Additionally, it is not clear that the Board can remedy the situation. The Board may lack jurisdiction to give McLeodUSA any immediate relief because these charges are terms of the interconnection agreement between the parties. Under federal law, the Board cannot change the terms of an approved interconnection agreement. A state commission's only authority "over interstate traffic" under 47 U.S.C. § 252 is its authority "to approve new arbitrated interconnection agreements and to interpret existing ones according to their own terms." The Amendment was filed with the Board, no party filed comments claiming discrimination existed, and the Amendment was approved, so it is now a binding part of the interconnection agreement between the parties.

Based on the limited record available in this docket, the Board is concerned about Qwest's practices in this respect. This subject should be revisited, and more fully developed, in an appropriate docket, that is, one in which the Board can order relief, if appropriate. That may be an interconnection cost docket, an arbitration docket, or some other proceeding.

*Id.* at 13–15.

IUB member Curtis Stamp filed a concurrence to the Final Order, stating that he agreed with his colleagues "that there may be a reasonable or justifiable reason for Qwest treating itself differently when it comes to engineering and installing power plant than it does for collocators such as McLeodUSA," but expressing doubt that the IUB could offer no remedy or relief if an ICA was found to have been applied in a discriminatory manner. *Id.* at 19–20. Indeed, Stamp stated, "If no justifiable reason for the way in which Qwest discriminates against McLeodUSA and other CLECs in the way it engineers, and more importantly allocates costs, for central office power plant exists, the Board would

have the duty to order Qwest to remedy the situation. Interpretation consistent with Board orders and state and federal law would be justified as such, and not as impermissible modification of the interconnection agreement." *Id.* at 20.

In August 2006, McLeod and the OCA petitioned for rehearing of the IUB's Final Order, asserting that the record before the IUB was adequate to find unlawful discrimination on the part of Qwest, and that, if discrimination were found, the IUB had the authority to address it. *See* Jt. App., Tab 3, at 3 (IUB Order Denying Application for Rehearing). McLeod argued that "if there was enough information in the record to determine that Qwest was treating CLECs differently than it was treating itself, then there was enough information in the record to determine that Qwest was behaving in a discriminatory manner." *Id.* at 9. Further, McLeod and the OCA argued that the prohibition of discriminatory behavior in state and federal law "is absolute" and that the IUB erred in finding that discrimination may be permitted if it was "justified." *Id.* at 10. Qwest countered that McLeod cannot unilaterally amend an ICA by claiming that an agreed-upon term is now discriminatory, and further argued that, since Qwest does not provide collocation to itself, "it is difficult to draw the comparison that McLeodUSA seeks to make with regard to the equality of collocation." *Id.* at 11. Finally, Qwest asserted that different does not always equate to discriminatory, and that "no case or FCC opinion has ever imposed an 'absolute' standard of non-discrimination as [McLeod and OCA] contend." *Id.* at 12. The IUB denied McLeod and the OCA's request for rehearing, agreeing with Qwest's assertion that " 'different' does not always equal 'discriminatory,' " and finding that neither McLeod nor the OCA had provided "significant, relevant authority supporting their position that the prohibi-

tion of discrimination is an absolute prohibition of different treatment."[15] *Id.* at 12–13.

### III. STANDARD OF REVIEW

 McLeod brings the present action pursuant to 47 U.S.C. § 252(e)(6), which provides: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." In reviewing the IUB's determinations, the Court must "review[ ] its interpretations of federal law de novo, but uphold[ ] its factual conclusion unless they are arbitrary and capricious." *Alma Comms. v. Missouri Pub. Serv.*, 490 F.3d 619, 624 (8th Cir.2007) (citing *Ace Tel. Ass'n v. Koppendrayer*, 432 F.3d 876, 878 (8th Cir.2005)). Furthermore, in interpreting any relevant federal statutes, namely the provision of the Telecommunications Act, the Court must "defer to existing interpretations by the FCC, which Congress authorized to interpret and administer the Act." *Id.* (citing *WWC License, LLC v. Boyle*, 459 F.3d 880, 890 (8th Cir.2006)).

### IV. LAW AND ANALYSIS

In the present action, McLeod and the OCA argue that the IUB erred as a matter of law when it made the factual conclusion that "Qwest treats CLECs differently" with regard to power charges, but declined to find that such different treatment constituted unlawful discrimination under 47 U.S.C. § 251(c)(6) and under Iowa Code § 476.100(2). McLeod additionally argues that the IUB failed to apply the proper standards of contract interpretation when interpreting the ICA, as amended by the 2004 Amendment. McLeod claims that when the proper standards of contract interpretation are applied to the ICA and the 2004 Amendment, it is clear that the ICA itself prohibits Qwest from treating McLeod differently than it treats itself with regard to power plant charges. Finally, the OCA argues that the IUB erred by failing to consider the effects of its decision on competition in the telecommunications market, as required by Iowa Code § 476.95(2), and that the interests of competition favor a finding that Qwest is unlawfully discriminating against McLeod in regard to power plant charges.

#### A. 47 U.S.C. § 251(c) (McLeod's Count I)

As previously discussed, 47 U.S.C. § 251 generally lays out the obligations of telecommunications carriers with regard to interconnection. Under the statutory rubric, ILECs have a duty to provide interconnection on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title." 47 U.S.C § 251(c)(2). Section 251(c)(3) provides identical language, requiring ILECs to provide access to UNEs on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." Likewise, § 251(c)(6), requires ILECs to provide collocation on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." At issue in the present case is the interpretation of the term "nondiscriminatory" as used throughout § 251(c). Specifically, McLeod and the OCA argue that the term "nondiscriminatory," as used in § 251(c), is unqualified and thus, absolute, meaning that any differential treatment of McLeod by Qwest

---

**15.** In the order denying rehearing, the IUB briefly acknowledged that McLeod's claims of discrimination arise under federal, as well as state law, but did not elucidate further.

is necessarily in violation of the statute. The IUB and Qwest, on the other hand, argue that the term "nondiscriminatory," as used in the statute, is not absolute, i.e., that "different" does not necessarily mean "discriminatory," and that Qwest's differential treatment of McLeod and itself with regard to billing power plant may not be discriminatory if a reasonable basis exists warranting the disparity.

In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the United States Supreme Court found that courts must defer to administrative interpretations, holding that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation [of that provision] made by the administrator of [the agency entrusted with administration of the statute at issue]." 467 U.S. at 844, 104 S.Ct. 2778. Thus, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X*, 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (citing *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778). With regard to the Telecommunications Act, Congress has specifically delegated authority to administer the Act to the Federal Communications Commission (the "FCC"). *See* 47 U.S.C. § 151 ("For the purpose of regulating interstate and foreign commerce in communication by wire and radio ... there is created a commission to be known as the 'Federal Communications Commission' ... which shall execute and enforce the provisions of this chapter."); *see also Nat'l Cable*, 545 U.S. at 981, 125 S.Ct. 2688 (applying the FCC's interpretations to the Telecommunications Act); *AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 378, 119 S.Ct. 721, 142

L.Ed.2d 835 (1999) ("The FCC has rulemaking authority to carry out the 'provisions of this Act,' which include §§ 251 and 252, added by the Telecommunications Act of 1996."). Accordingly, under the *Chevron* framework, this Court must defer to any FCC interpretation of the term "nondiscriminatory," as it is used in § 251(c).

█ The parties concede that any FCC interpretation of the nondiscrimination standard of § 251(c) should control in this case. *See* McLeod's Br. at 18; OCA's Br. at 16; Qwest's Br. at 21; IUB's Br. at 4. The most relevant and significant authority on interpretation of various provisions of the Telecommunications Act, promulgated by the FCC, is the FCC's First Report and Order. *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996* (hereinafter "Local Competition Order"), 11 F.C.C.R. 15499 (Aug. 8, 1996). In Subsection G of the Local Competition Order, the FCC undertook discussion of the "just, reasonable, and nondiscriminatory rates, terms, and conditions of interconnection," as provided for in § 251(c)(2)(D). The FCC noted that in its Notice of Proposed Rulemaking ("NPRM"), it "sought comment on how we should determine whether the terms and conditions for interconnection arrangements are just, reasonable, and nondiscriminatory, and how we should enforce such rules." Local Competition Order ¶ 213. The FCC concluded that "national standards for just, reasonable, and nondiscriminatory terms and conditions of interconnection will be in the public interest...." *Id.* ¶ 216.

The FCC went on to contrast the "nondiscriminatory" standard of § 251(c) with the discrimination standard of 47 U.S.C. § 202(a). Section 202(a) provides: "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices ... or

services for or in connection with like communication service, directly or indirectly, by any means or device...." The FCC stated:

> The nondiscrimination requirement in section 251(c)(2) is not qualified by the 'unjust or unreasonable' language of section 202(a). We therefore conclude that Congress did not intend that the term 'nondiscriminatory' in the 1996 Act be synonymous with 'unjust and unreasonable discrimination' used in the 1934 Act, but rather, intended a more stringent standard.

*Id.* ¶ 217. Thus, the plain language of the FCC Local Competition Order compels this Court to interpret § 251(c)'s "nondiscriminatory" standard in a more stringent fashion than it would interpret the "unreasonable discrimination" standard of § 202(a). It is equally clear that the more stringent standard of the "nondiscriminatory" language of § 251(c)(2) is equally applicable to the same language which appears in § 251(c)(3), dealing with UNEs, and § 251(c)(6), dealing with collocation, and that the FCC intends for an ILEC to be nondiscriminatory both in the way it treats a CLEC in comparison to another CLEC and in the way it treats a CLEC in comparison to itself: [16] "We believe that the term 'nondiscriminatory,' as used throughout section 251, applies to the terms and conditions an [ILEC] imposes on third parties as well as on itself." *Id.* ¶ 218. Having determined these factors, the Court turns to the ultimate disagreement in this litigation, that is, the question of just how much more stringent the § 251(c) "nondiscriminatory" standard is than the § 202(a) "unreasonable discrimination" standard.

McLeod and the OCA both argue that FCC's Local Competition Order gives rise to a conclusion that the "nondiscriminatory" standard of § 251(c) is "absolute," that is, that any difference in the way Qwest treats McLeod compared to the way Qwest treats itself violates § 251(c)'s requirement that the rates, terms, and conditions of interconnection and collocation be "nondiscriminatory." Accordingly, under McLeod and the OCA's reasoning, the fact that the IUB found that Qwest was billing DC Power Plant to itself on the basis of List 1 Drain, but was billing McLeod on the basis of more costly List 2 Drain, necessarily gives rise to a conclusion that Qwest was discriminating against McLeod in violation of § 251(c). Specifically, the OCA argues that the FCC held "that the prohibition against discrimination that appears throughout Section 251 of the Act is 'unqualified,'" such that § 251(c)(6) must be found to prohibit *"any* discrimination whatsoever." OCA Br. at 17. In support of this position, the OCA defines the term "unqualified" as meaning " '[n]ot modified by conditions or reservations; **absolute;** an *unqualified* refusal.' " *Id.* (emphasis in original, quoting American Heritage College Dictionary 1479 (3d ed.)). The problem with the OCA's position in this regard, however, is that the term "unqualified" does not appear in the FCC's Local Competition Order. Rather, the FCC stated only that the nondiscrimination requirement in § 251(c)(2) is "not qualified by the 'unjust or unreasonable' language of section 202(a)." Local Competition Order ¶ 217. The fact that the FCC has concluded that the term "nondiscriminatory," as used in § 251(c) is "not qualified" by cer-

---

**16.** Indeed, the FCC explicitly rejected the notion that ILECs only had an obligation to treat CLECs similarly, as opposed to having an obligation to treat CLECs similarly to one another and similarly to the ILEC: "Therefore, we reject for purposes of section 251, our historical interpretation of 'nondiscriminatory,' which we interpreted to mean a comparison between what the [ILEC] provided *other parties* in a regulated monopoly environment." Local Competition Order ¶ 218 (emphasis added).

tain language used in § 202(a), however, is not the equivalent of the FCC stating that the term "nondiscriminatory," as used in § 251(c) is entirely unqualified for all purposes.

Discussion by the FCC later in the Local Competition Order supports a conclusion that the "nondiscriminatory" standard of § 251(c) is not "absolute." In its NPRM, the FCC highlighted the contrast between the use of the term "nondiscriminatory" in §§ 251 and 252 and the use of the term "unreasonable discrimination" in § 202(a). *Id.* ¶ 852. The FCC "sought comment on the meaning of the term 'nondiscriminatory' in the 1996 Act compared with the phrase 'unreasonable discrimination' in the 1934 Act." *Id.* ¶ 852. Generally, the feedback the FCC received was parsed into three distinct categories of thought: 1) commentators that believed the term "nondiscriminatory" was synonymous with "unreasonable discrimination"; 2) commentators that thought the term "nondiscriminatory" necessarily has a more stringent meaning than does the phrase "unreasonable discrimination," but still with exceptions for cost-based price differences; and 3) commentators who thought the term "nondiscriminatory" was without any qualification whatsoever, i.e., the term must be strictly and absolutely construed such that *any* discrimination would be a violation. *Id.* ¶¶ 853–55.

Considering the varied positions of interested commentators, the FCC concluded:

> We conclude that the term "nondiscriminatory" in the 1996 Act is not synonymous with "unjust and unreasonable discrimination" in section 202(a), but rather is a more stringent standard. Finding otherwise would fail to give meaning to Congress's decision to use different language. We agree, however, with those parties that argue that cost-based differ-

ences in rates are permissible under sections 251 and 252.

*Id.* ¶ 859.

Thus, the "nondiscriminatory" standard of § 251(c) cannot be "absolute," given that the FCC explicitly recognized that cost-based differences would constitute a legitimate basis for differential treatment under § 251(c). This conclusion begs the question, however, of just how stringent the "nondiscriminatory" standard is, given that the FCC has explicitly found "nondiscriminatory" is a more stringent standard than "unreasonable discrimination." After discussing the justification for cost-based differences in treatment under the "nondiscriminatory" standard, the FCC stated:

> On the other hand, *price difference based not on cost diferences,* but on such considerations as competitive relationships, the technology used by the requesting carrier, the nature of the service the requesting carrier provides, *or other factors not reflecting costs, the requirements of the Act, or applicable rules, would be discriminatory and not permissible under the new standard.* Such examples include the imposition of different rates, terms and conditions based on the fact that the competing provider does or does not compete with the incumbent LEC, or offers service via wireless rather than wireline facilities. *We find that it would be unlawfully discriminatory, in violation of sections 251* and 252, if an incumbent LEC were to charge one class of interconnecting carriers … higher rates for interconnection than it charges other carriers, *unless the diferent rates could be justified by differences in the costs incurred by the incumbent LEC.*

*Id.* ¶ 861 (emphasis added). The italicized portions of the excerpt make clear that the only permissible deviations from the "nondiscriminatory" standard of § 251 are for

price differences based on "factors reflecting costs, the requirements of the Act, or applicable rules." *Id.* If a price difference is due to some other factor, it is "not permissible" under the "nondiscriminatory" standard of § 251.

This reading of the FCC Local Competition Order in regard to § 251(c) is reinforced by other provisions of the Local Competition Order. For example, in a discussion regarding the "nondiscriminatory access to network elements on an unbundled basis" requirement of § 251(c)(3), the FCC noted that Congress had not set forth an "absolute equal in quality requirement," as it had in regard to interconnection under § 251(c)(2)(C). *See id.* ¶ 313; 47 U.S.C. § 251(c)(2)(C) (obligating an ILEC to provide interconnection "that is at least equal in quality to that provided by the [ILEC] to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection"). The IUB points out that, in the present case, § 251(c)(6), relating to collocation, also "does not use language like § 251(c)(2)(C)'s 'at least equal in quality' standard and therefore does not establish an absolute standard." IUB Br. at 5. The FCC pointed out, however, that the only reason that Congress declined to include an "absolute equal in quality" requirement in § 251(c)(3) was the fact that, "in rare circumstances, it may be technically infeasible for incumbent LECs to provide requesting carriers with unbundled elements, and access to such elements, that are equal in quality to what the incumbent LECs provide themselves." Local Competition Order ¶ 313. Thus, despite the lack of formal language in § 251(c)(3), the FCC nonetheless requires "incumbent LECs to provide access and unbundled elements that are at least equal in quality to what the incumbent LECs provide themselves, and allow for an exception to this requirement *only* where it is technically infeasible to meet."[17] *Id.* (emphasis added). It is reasonable to extrapolate, when viewing all relevant provisions of the Local Competition Order, that the FCC would read the same "equal in quality" requirement into the rates, terms and conditions of collocation in § 251(c)(6), save for the only exception to the nondiscriminatory requirement recognized in ¶ 861, for price differences based on "factors reflecting costs, the requirements of the Act, or applicable rules."

The FCC's finding that the term "nondiscriminatory" implies a stringent standard is entirely consistent with a plain reading of § 251(c) in general, which requires that ILECs provide CLECs with interconnection, UNEs, and collocation on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." The term reasonable in no way modifies the term nondiscriminatory, and the use of the term "and" indicates a clear requirement that the rates, terms and conditions be just *and* reasonable *and* nondiscriminatory, not that the rates, terms and conditions may be discriminatory if they are also reasonable. The FCC's interpretation of the term nondiscriminatory as used in § 251(c) gives meaning to all the words of the statute. *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 35–36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect."). Moreover, the plain language of the FCC's Local Competition Order provides a mechanism whereby the

---

**17.** It is reasonable to conclude that the "technically infeasible" exception to § 251(c)(3) would be equally applicable to §§ 251(c)(6), however, there is no argument by Qwest that it is "technically infeasible" for it to assess power plant costs to McLeod in the same manner it assesses those costs to itself. Accordingly, since the "technically infeasible" exception plays no role in the present proceedings, the Court will only address the "price difference" exception.

"stringent" standard of the term "nondiscriminatory" may be applied. That is, the FCC has clearly stated that "cost-based differences in rates are permissible under section[ ] 251," and that "price differences based not on cost differences ... would be discriminatory and not permissible under the [nondiscriminatory standard of § 251]." Local Competition Order ¶ 859–61.

Likewise, the Court's reading of the FCC Local Competition Order is consistent with the "procompetitive purposes" of the 1996 Act in general. *Id.* ¶¶ 249, 283, 579. The FCC repeatedly recognizes in the Local Competition Order that there is an "imbalance in bargaining power between incumbent LECs and competitors," that ILECs have "the incentive to discriminate against [ ] competitors by providing them less favorable terms and conditions of interconnection than [the ILEC] provides itself," and that the 1996 Act was designed to "remove barriers to entry by potential competitors and speed the development of competition." *Id.* ¶¶ 216–18, 588. Indeed, the FCC Local Competition Order was specifically designed to aid in fulfilling the goals of the 1996 Act, i.e., to open the local exchange and access markets to competitive entry, to promote increased competition in telecommunications markets already open to competition, and to reform the system of universal service as the local exchange and exchange access markets move from monopoly to competition. *Id.* ¶ 3. Thus, the Local Competition Order was designed to "implement the local competition provisions of the 1996 Act" by "remov[ing] not only statutory and regulatory impediments to competition, but economic and operational impediments as well." *Id.* ¶¶ 3, 6.

Having established that the only exception to Qwest's obligation to provide collocation power to McLeod "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory" is for cost-based differences, the Court now must turn to the question of whether the IUB applied a correct interpretation of federal law when analyzing McLeod's assertions of discrimination under § 251(c). The IUB asserts that, after applying the "nondiscrimination standard of § 251(c)(6), the Board analyzed the record evidence and determined that McLeod had shown that Qwest's treatment of McLeod with regard to power plan[t] charges was different than its treatment of itself, but McLeod had not shown the difference was discriminatory, even under a stringent standard." IUB Br. at 6. A review of the IUB's July 27, 2006 Final Order, however, reveals absolutely no discussion at all of § 251(c). The IUB only analyzed McLeod's discrimination claim in that Order under the provisions of the Iowa Code. It neither analyzed McLeod's discrimination claim under the relevant federal statute, nor reviewed the FCC's Local Competition Order. In its discussion under the Iowa Code, however, the IUB made several factual determinations:

> Qwest has not expended capital on power capacity augmentation that would equate to McLeodUSA power ordered. Only one instance of power plant augmentation (directly attributable to McLeodUSA) was shown at the hearing and that installation was necessary due to the age and obsolescence of the existing power plant.
>
> Further, power plant facilities are not dedicated to individual companies, but are common to all those within a central office. This includes Qwest and all CLECs collocating in that office. Typically, an order for power from an individual CLEC does not require additional investment in power plant facilities. Instead, it is the total power consumption by Qwest and all the CLECs that would trigger the need for additional power plant facilities. As a result, the sum of

the total power ordered is typically greater than the total of the power plant available. However, Qwest charges each CLEC on the basis of the power ordered.

Because Qwest is assessing the power plant based on the number of amps included in a CLEC's original order for power delivery cables, the CLECs may be subsidizing Qwest and thereby reducing Qwest's cost of providing service to its own end users. Moreover, Qwest admits that it assigns Power Plant costs to itself based on List 1 Drain (which approximates its actual use), but charges CLECs based on the amount of power ordered (which approximates List 2 Drain).

Jt. App., Tab 3 at 13–14. The IUB stated that "[t]he available evidence indicates a valid concern exists regarding possible discrimination, but the record has not been fully developed on this issue." *Id.* at 14. Specifically, the IUB found that while "it is clear that Qwest treats CLECs differently in this respect, it is not so clear whether *there is a reasonable basis* for this difference or that the resulting difference is significant." *Id.* (emphasis added). Concerned about its jurisdiction and ability to afford McLeod a remedy, the IUB encouraged McLeod to commence a new proceeding where the matter could be "more fully developed." *Id.* at 15.

None of the parties dispute the factual findings of the IUB, namely that Qwest allocates power plant charges to itself in a manner different from the way it assesses charges to McLeod for usage of the same resource. Accordingly, the Court can find nothing arbitrary or capricious in the IUB's factual determinations articulated in the block quote above. *See Alma Comms.*, 490 F.3d at 624 (finding a court must uphold the factual conclusion of a state board unless such conclusions are "arbitrary and capricious"). To the extent, however, that the IUB first, failed to consider McLeod's claims under § 251(c) at all, and second, found that Qwest's differential treatment of McLeod in regard to power plant charges might be justified if there exists "a reasonable basis" for the difference, the IUB misapplied the relevant federal law. As discussed extensively *supra*, the FCC has rejected an interpretation of the term "nondiscriminatory" in § 251(c) that equates with "unjust and unreasonable discrimination." A natural corollary of this holding is that discriminatory treatment cannot be permitted simply because it is "reasonable."

McLeod and the OCA are, therefore, correct in the assertion that the IUB erred in its conclusion that Qwest might not be in violation of § 251(c) if its disparate treatment of McLeod was "reasonable." McLeod and the OCA are incorrect, however, in the assertion that Qwest's differential treatment is *necessarily* discriminatory under § 251(c).[18] The proper inquiry

---

**18.** In the IUB's Order Denying Application for Rehearing, the IUB again stated that, "based on the available record, Qwest treats CLECs differently than it treats itself with respect to the power plant charges." Jt. App., Tab 3, at 12. "However, the Board also determined that the record was not well-developed on this issue and it was not clear whether there was a reasonable basis for this difference. The Board agrees with Qwest's assertion that 'different' does not always equal 'discriminatory.'" *Id.* Given the Court's discussion of the FCC's Local Compe- tition Order, *supra*, the Board was correct in concluding that "'different' does not always equal 'discriminatory.'" *Id.* However, the question of whether there existed a "reasonable basis" for Qwest's treating McLeod differently than it treats itself with regard to power plant charges highlights the IUB's error in applying the appropriate interpretation of the federal statute. Moreover, the IUB stated that "neither McLeodUSA nor Consumer Advocate offered significant, relevant authority supporting the position that the prohibition of discrimination is an absolute pro-

is whether Qwest's differential assessment of charges to McLeod with respect to power plant charges is based on cost differences. If the differential pricing is based on legitimate cost differences, Qwest is not discriminating against McLeod, pursuant to § 251(c). If, however, the differential pricing is *not* due to factors reflecting cost differences, Qwest is in violation of the "nondiscrimination" requirement of § 251(c) and McLeod may be entitled to a remedy if there is no other impediment to relief.

## B. *Iowa Code § 476.100(2)—* *(McLeod's Count II)*

Iowa Code § 476.100(2) provides that a local exchange carrier shall not "discriminate against another provider of communications services by refusing or delaying access to essential facilities on terms and conditions no less favorable than those the local exchange carrier provides to itself and its affiliates." The IUB argues that this provision means simply that the terms and conditions Qwest used to bill McLeod for power plant charges must be "no less favorable" than the terms and conditions on which Qwest provided power plant access to itself. The IUB counters, however, that "the state statute recognizes that the terms can be different and not violate the law so long as they are at least as favorable to the CLEC as they are to Qwest. This requires an examination of all the facts and circumstances surrounding any particular claim, based on a fully-developed record that was not present in this case." IUB Br. at 10.

The IUB notes several cases where it has applied a stringent standard of review

hibition of different treatment." *Id.* at 13. Both McLeod and the OCA, however, have repeatedly cited to the FCC's Local Competition Order, both before the IUB and before this Court. It is unclear then, why the IUB, at least in its written orders, never undertook any analysis of, or even mentioned the Local

to § 476.100(2), and found that an ILEC was in violation of the state statute. The IUB states: "In each of these cases, the evidence showed that (a) the ILEC was discriminating against the CLEC by providing itself with better service and (b) the CLEC suffered competitive harm as a result." *Id.* at 12. The IUB claims that McLeod failed to satisfy those two elements in this case, having proven only that Qwest treats itself differently, not necessarily better, and having failed to prove that McLeod suffered competitive harm as a result of Qwest's alleged inferior treatment.

■ The Court finds the IUB's argument in this regard somewhat disingenuous. With regard to the first element, whether Qwest was providing itself with better service, the IUB's Final Order appears to state that it was. Indeed, there is no dispute in the record that Qwest allocates power plant costs to itself on the basis of List 1 Drain, but charges McLeod for the same power plant costs on the basis of List 2 Drain. *See* Jt. App., Tab 3, at 14. The record evidence before the IUB supports a conclusion that List 1 Drain costs anywhere from 30–70% less than List 2 Drain. For example, Qwest's witness, Robert Hubbard, testified that List 1 Drain is "about 40 to 70%, depending on the central office, of the actual List 2 Drain." Jt. App., Tab 14, at 599. And Qwest's own technical publication states that "a rough estimate of List 1 Drain is 30–40% of List 2 Drain." *Qwest Technical Publication: Commercial Customer Premises Electronic Equipment Environmental Specifications and Installation*

Competition Order, particularly given that the IUB concedes that the Local Competition Order is "the most relevant and significant authority regarding the meaning of the nondiscrimination standard in § 251(c)...." IUB Br. at 4.

*Guide,* # 77368 Issue E (Mar.2006). Additionally, McLeod witness Sidney Morrison testified that "List 2 Drain significantly exceeds the List 1 Drain, which means that Qwest's billing of McLeodUSA for DC power plant based on the higher power requirements of a List 2 Drain results in DC power plant charges that significantly exceed the charges that would result from applying the charge to the List 1 Drain." Jt. App., Tab 13, at 63. With this record evidence alone, it is difficult to contemplate that the IUB lacked sufficient information from which to conclude that Qwest imputing power charges to itself that were anywhere from 30–70% less costly than the power charges it imputed to McLeod could not establish both that Qwest was treating itself more favorably with regard to power plant charges, and that the increased financial costs to McLeod caused McLeod competitive harm.

Moreover, with regard to the second element, competitive harm the IUB further argues that McLeod's witness testified that Qwest's method of billing McLeod for power plant resulted in approximately "$63,000 more in power costs per month" to McLeod," but that the witness "calculated McLeod's alleged damages only for McLeod's first claim, involving the proper interpretation of the 2004 Amendment." IUB Br. at 12 n. 6. Thus, the IUB argues that "[t]here was no testimony to tie this estimate of damages to McLeod's nondiscrimination claim" and that "McLeod did not prove it was financially harmed by the difference in treatment." *Id.* The Court finds this attempt to distinguish the witness's testimony unwarranted. Had the IUB found that the 2004 Amendment required Qwest to charge McLeod at the List 1 Drain, or had the IUB found that

Qwest was discriminating against McLeod in the way it billed McLeod for power plant, the ultimate financial detriment to McLeod would be approximately the same, i.e., the difference between the amount Qwest "charges" itself (which is approximately List 1 Drain) and the amount Qwest charges McLeod (List 2 Drain). To assert that McLeod has failed to show any competitive harm simply because the witness's calculations were based on "actual usage," rather than on List 1 Drain, ignores the clear evidence that the two are approximately equal, and that, in any event, both "actual usage" and "List 1 Drain" are substantially less costly than List 2 Drain.

Regardless, the IUB misapplied § 476.100(2) by reading into the statute a "reasonableness" exception where none exists.[19] *See* Jt. App., Tab 3, at 14 ("Although it is clear that Qwest treats CLECs differently in this respect, it is not so clear whether there is a reasonable basis for this difference or that the resulting difference is significant."). Indeed, under the FCC's authoritative Local Competition Order, "[s]tate regulations permitting non-cost based discriminatory treatment are prohibited by the 1996 Act." Local Competition Order ¶ 862. Thus, even if the Iowa statute could be read to permit "reasonable" discrimination, the FCC's interpretation of the federal requirements would make such discrimination unlawful. Moreover, the plain language of § 476.100(2) is clear, leaving no room for an inference that the legislature intended a "reasonableness" exception: ILECS must provide CLECs access to essential facilities on terms and conditions

---

**19.** As noted previously, the IUB only considered § 476.100(2) in its Final Order issued July 27, 2006, concluding that a finding of discrimination thereunder was not appropri-

ate because Qwest might have a "reasonable basis" for Qwest's differential treatment of McLeod in the billing of power plant charges. *See* Jt. App., Tab 2, at 14.

"no less favorable" than those the ILEC provides to itself.

### C. *The 2004 Amendment— (McLeod's Count III)*

█ McLeod next contends that the IUB misconstrued the terms of the ICA, as amended by the 2004 Amendment, by failing to apply the proper standards of contract interpretation. The original ICA entered into by the parties in 1997 provides in Part IV (Ancillary Functions) that Qwest will provide certain ancillary functions to McLeod so that McLeod "may obtain and use unbundled Network Elements or the ILEC services to provide services to its customers." Clerk's No. 1.2 (hereinafter "ICA") ¶ 38.1. The ICA states that "[t]he ILEC will offer Ancillary Functions to the CLEC on rates, terms and conditions that are just, reasonable, and nondiscriminatory and in accordance with the terms and conditions of this Agreement." *Id.* ¶ 39. More specifically, the ICA provides that subsections "29.1 through 39.3 ... list the Ancillary Functions that the CLEC and the ILEC have identified as of the Effective Date of this Agreement." ICA ¶ 39. Subsection 39.1 identifies one such ancillary function as "collocation," defined as "the right of the CLEC to obtain dedicated space in the ILEC Local Serving Office (LSO) or at other ILEC locations and to place equipment in such spaces to interconnect with the ILEC network. Collocation also includes the ILEC providing resources necessary for the operation and economical use of collocated equipment." *Id.* ¶ 39.1. Section 40 of the ICA, entitled "Standards for Ancillary Functions," provides:

Each Ancillary Function provided by the ILEC to the CLEC shall be at least equal in the quality of design, performance, features, functions and other characteristics, including, but not limited to levels and types of redundant equipment and facilities for diversity and security,

that the ILEC provides in the ILEC network to itself and to any other party. *Id.* ¶ 40.1. Attachment 4 of the ICA provides more detailed information regarding the specific agreement between the parties regarding the collocation Ancillary Function, and states:

Power as referenced in this document refers to any electrical power source supplied by the ILEC for the CLEC equipment. It includes all superstructure, infrastructure, and overhead facilities, including, but not limited to, cable, cable racks and bus bars. The ILEC will supply power to support the CLEC equipment at equipment specific DC and AC voltages. At a minimum, the ILEC shall supply power to the CLEC at parity with that provided by the ILEC to itself or to any third party.

ICA, ¶ 2.2.24. The ICA was initially approved by the IUB on December 15, 1997.

In August 2004, Qwest and McLeod executed a document entitled "DC Power Measuring Amendment to the Interconnection Agreement between Qwest Corporation and McLeodUSA Telecommunications Services, Inc. for the State of Iowa." Jt. App., Tab 16 (hereinafter "2004 Amend."). The 2004 Amendment specifically states that the ICA of the parties "is hereby amended by adding the terms, conditions and rates for DC Power Measuring, as set forth in Attachment 1, attached hereto and incorporated herein," and that "[e]xcept as modified herein, the provisions of the [ICA] shall remain in full force and effect." 2004 Amend. at 1. Attachment 1 of the 2004 Amendment provides:

1.0 **Monitoring**

1.1 CLEC orders DC power in increments of twenty (20) amps whenever possible. If CLEC orders an increment larger than sixty (60) amps, engineering practice normally terminates such feed on a power

board. If CLEC order an increment smaller than or equal to sixty (60) amps, the terminations will normally appear on a Battery Distribution Fuse Board (BDFB).

1.2 If CLEC orders sixty (60) amps or less, it will normally be placed on a BDFB where no monitoring will occur since the power usage rate reflects a discount from the rates for those feeds greater than sixty (60) amps. If CLEC orders more than sixty (60) amps of power, it normally will be placed on the power board. Qwest will monitor usage at the power board on a semi-annual basis. However, Qwest also agrees to take a reading within thirty (30) days of a written CLEC request, after CLEC's installation of new equipment. Qwest will perform a maximum of four (4) readings per year on a particular collocation site. Based on these readings, if CLEC is utilizing less than the ordered amount of power, Qwest will reduce the monthly usage rate to CLEC's actual use. If CLEC is utilizing more than the ordered amount, Qwest will increase the monthly usage rate to the CLEC's actual use. Until such time that CLEC places equipment and a request is received from CLEC to monitor, Qwest will bill CLEC based on the amount of power ordered. Once Qwest receives a CLEC monitoring request, it will bill the actual power usage rate from the date of the CLEC's monitoring request until the next reading. The next reading date may be generated as a result of the CLEC request or a Qwest routing reading and Billing will be adjusted on whichever date comes first.

2.0 **Rate Elements—All Collocation**

2.1 –48 Volt DC Power Usage and AC Usage Charges. Provide –48 Volt DC power to CLEC collocated equipment and is fused at one hundred twenty-five percent (125%) of request. The DC Power Usage Charge is for the capacity of the power plant available for CLEC's use. The AC Usage Charge is for the power used by CLEC. Both the DC Power Usage Charge and the AC Usage Charge are applied on a per ampere basis.

2.2 The –48 Volt DC Power Usage Charge is specified in Exhibit A of the Agreement and applies to the quantity of –48 Volt Capacity specified by the CLEC in its order.

2.2.1 –48 Volt DC Power Usage Charge—Applies on a per amp basis to all orders of greater than sixty (60) amps. Qwest will initially apply the –48 Volt DC Power Usage Charge from Exhibit A of the Agreement to the quantity of power ordered by CLEC. Qwest will determine the actual usage at the power board as described in Section 1.2. There is a one (1) amp minimum charge for –48 Volt DC Power Usage.

2.3 CLEC rates for Collocation must be included in CLEC's existing Interconnection Agreement with Qwest prior to amending with DC Power Monitoring (Measuring) Amendment.

2004 Amend., Attachment 1.

The IUB noted that Exhibit A, the pricing pages to the parties' ICA, specifies the certain rates for power usage. Under the heading "–48 Volt DC Power Usage," the pricing pages provide for a $12.17 rate applicable to "Power Plant, per amp"; $2.19 applicable to "Power Usage Less Than 60 Amps, per Amp"; and $4.37 appli-

cable to "Power Usage More Than 60 Amps, per Amp." Jt. App., Tab 2, at 5. Qwest argued before the IUB that the 2004 Amendment only changed the way that "power usage" charges were to be billed, and not the way that "power plant" charges were to be billed. Specifically, Qwest urged that the term "–48 Volt DC Power Usage Charge," as used in the 2004 Amendment, does not apply to the entire group of rate elements, but rather refers only to the "Power Usage More Than 60 Amps, per Amp" element. *Id.* at 6. McLeod, on the other hand, argued that the "–48 Volt DC Power Usage Charge," as used in the 2004 Amendment was clearly applicable to both the "Power Plant per Amp" and the "Power Usage More Than 60 Amps, per Amp" rate elements. In short, after the 2004 Amendment became effective, Qwest charged McLeod for the "Power Usage" element on an "actual use" basis, but continued charging the "Power Plant" element on an "as ordered" basis, despite McLeod's insistence that "Power Plant" should also be charged on an "actual use" basis.

The IUB found that the language of the 2004 Amendment was not clear, such that the meaning of the Amendment could not be determined without resort to extrinsic evidence. In particular, the IUB determined:

> Each party has provided an interpretation that supports its desired outcome, and both interpretations are reasonable. The terminology of the Amendment does not precisely match the terms used in the pricing pages, creating ambiguity. Indeed, the very fact that either party's interpretation is sustainable leads to the conclusion that the language is not clear on its face and the Board must therefore look to other evidence in the record to determine the proper interpretation of the Amendment.

*Id.* at 6–7 (citing *RPC Liquidation v. Iowa Dept. of Transp.*, 717 N.W.2d 317 (Iowa 2006)). Looking to the extrinsic evidence offered by the parties, the IUB determined that the parties did not intend for the 2004 Amendment to change the way in which the "Power Plant" rate element was billed from an "as ordered" basis to an "actual use" basis. The IUB found compelling evidence that: 1) McLeod did not protest the way Qwest was applying the 2004 Amendment until approximately six months had passed; and 2) McLeod had produced an internal spreadsheet prior to execution of the 2004 Amendment purporting to calculate the savings of the Amendment, but the spreadsheet did not calculate any savings associated with the "Power Plant" rate element.

McLeod argues that the IUB's interpretation of the 2004 Amendment was in error because the IUB evaluated the 2004 Amendment as a stand-alone document, without reviewing the other terms of the ICA, namely the provision in § 2.2.24 of Attachment 4 to the ICA which provides that "[a]t a minimum, the ILEC shall supply power to the CLEC at parity with that provided to the ILEC to itself or to any third party." According to McLeod, the IUB interpretation of the 2004 Amendment renders this provision meaningless, because the IUB's interpretation permits Qwest to bill McLeod substantially more for accessing DC power than what would be billed if Qwest treated McLeod in the same manner it treats itself.

 Under the general rules of contract interpretation, the intent of the parties in creating the contract controls. *Smith Barney, Inc. v. Keeney*, 570 N.W.2d 75, 78 (Iowa 1997). Unless there is an ambiguity, however, the intent of the parties is determined by what the contract itself says. *Id.* (citing *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,*

471 N.W.2d 859, 862 (Iowa 1991)). "A contract is to be interpreted as a whole, and it is assumed in the first instance that no part of it is superfluous." *Id.* (citing *Iowa Fuel,* 471 N.W.2d at 863). "The interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect." *Id.* (citing *Iowa Fuel,* 471 N.W.2d at 863).

In interpreting a contract, the Court must engage in a two step process. *Walsh v. Nelson,* 622 N.W.2d 499, 503 (Iowa 2001). "First, from the words chosen, a court must determine 'what meanings are reasonably possible.' " *Id.* (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). "In so doing, the court determines whether a disputed term is ambiguous." *Id.* The question of whether a term is ambiguous will not be determined by the mere fact that the parties disagree about its meaning. *Id.* (citing *Hartig Drug Co. v. Hartig,* 602 N.W.2d 794, 797 (Iowa 1999)). Rather, a term is ambiguous if, " 'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.' " *Id.* (quoting *Hartig Drug Co.,* 602 N.W.2d at 797).

The Court does not find convincing McLeod's argument that § 2.2.24 is rendered nugatory under the IUB's interpretation of the 2004 Amendment. Section 2.2.24 actually reads: "The ILEC will supply power to support the CLEC equipment at equipment specific DC and AC voltages. At a minimum, the ILEC shall *supply power* to the CLEC *at parity with that* provided by the ILEC to itself or to any third party." ICA, Attachment. 4. The emphasized portions of § 2.2.24 highlight that the term "parity" does not appear to be related to the terms and conditions, i.e., the rates, on which power is supplied, but rather appears to relate strictly to "sup-

ply" of power. Furthermore, the term "parity" is defined as "the quality or state of being equal or equivalent." Merriam–Webster's Online Dictionary, *available at* http://www.merriamwebster.com/dictionary/parity. Equivalent does not mean identical, and it is reasonable to conclude that, even if the term "parity" was intended to apply to the *terms* on which power is supplied, there could be factors that would render Qwest's disparate billing terms nonetheless equivalent.

McLeod's argument cannot be summarily discarded, however, because § 39 of the ICA provides language which mirrors the federal standard of § 251(c)(6), applicable to collocation. Specifically, § 39 of the ICA provides that the "ILEC will offer Ancillary Functions to the CLEC on rates, terms and conditions that are just, reasonable, and non-discriminatory and in accordance with the terms of this Agreement." Thus, if Qwest's practice of billing power plant on an "as ordered" basis is deemed discriminatory, the IUB's interpretation of the 2004 Amendment would necessarily fail to give effect to the language of § 39 of the ICA. Such an outcome is in direct contravention of the fundamental rule of contract interpretation, that "a contract should be construed so as to give effect to all the contract's provisions . . . if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses in order to avoid rendering either one nugatory." *Johnson Controls, Inc. v. City of Cedar Rapids,* 713 F.2d 370, 374 (8th Cir.1983). Indeed, had the IUB considered the terms of the 2004 Amendment in conjunction with the ICA itself, it may not have found a need to discern the parties' intent from extrinsic evidence. Accordingly, the Court must conclude that, since the IUB did not consider any of the terms of the ICA itself in interpreting the

meaning of the 2004 Amendment, particularly the non-discriminatory language of § 39, the IUB failed to apply the proper legal principles of contract construction and as a result, its factual findings interpreting the 2004 Amendment were arbitrarily and capriciously made.[20]

### D. *Bars to Relief*

The Court has concluded that the IUB employed an erroneous interpretation of the term nondiscriminatory, as used in 47 U.S.C. § 251(c), that the IUB improperly read a "reasonableness" exception into Iowa Code § 476.100, and that the IUB improperly failed to consider the ICA, as a whole, when it interpreted the meaning of the 2004 Amendment. Despite these findings, the Court must still determine whether any other factors bar McLeod from further consideration of its claim. On the record before it, this determination requires the Court to consider two additional issues. First, assuming that the way in which McLeod is charged for power plant is discriminatory, that distinction is irrelevant if the parties agreed to the discriminatory practice, given that ICAs are binding and given that they may be voluntarily negotiated without regard to the standards of § 251(c). If this first issue is resolved in favor of McLeod and against Qwest, the Court must secondly evaluate whether there is sufficient evidence in the record for it to determine as a matter of law that Qwest's practices with regard to power plant billing are the result of cost differences, since price differences that are

the result of cost differences are nondiscriminatory under the FCC's interpretation of that term. An affirmative finding in this regard would render the IUB's failure to consider "discrimination" of no legal consequence.

1. *Did the parties voluntarily agree to "discriminatory" power plant billing?*

Qwest argues that, assuming that the way it bills McLeod for power plant is "discriminatory" under § 251(c) or under Iowa Code § 476.100, such discriminatory treatment is irrelevant since the parties agreed to the terms about which McLeod now complains. Specifically, Qwest points to 47 U.S.C. § 252(a)(1), which provides that an ILEC "may negotiate and enter into a binding agreement with [a telecommunications carrier requesting interconnection] without regard to the standards set forth in subsections (b) and (c) of section 251 of this title."

It is well settled that an ICA, once approved by the relevant state commission, is binding on the parties. Indeed, the IUB's "only authority over interstate traffic is its authority under 47 U.S.C. § 252 to approve new arbitrated interconnection agreements and to interpret existing ones according to their own terms." *Pac. Bell v. Pac W. Telecomm., Inc.*, 325 F.3d 1114, 1126 (9th Cir.2003). Here, Qwest argues that the IUB approved the ICA between the parties and also specifically approved the 2004 Amendment, such

---

**20.** While it is well settled that courts review state agency interpretations of federal law de novo and factual conclusions under an arbitrary and capricious standard, there is some debate over the proper standard applicable to a state agency's interpretation of state law legal principles. *See Connect Commc'ns Corp. v. Southwestern Bell*, 467 F.3d 703, 709 (8th Cir.2006) (reviewing a state agency's determination that contract language was ambiguous and discussing the de novo versus arbitrary and capricious standards, but ultimately declining to "wade through this standard of review quagmire" in light of the fact that the contract at issue was, indeed, ambiguous). Regardless which standard is proper, the IUB's failure to apply basic principles of contract construction is sufficient to remand the case under either the de novo or the arbitrary and capricious standard of review.

that the "contracts and rates have the 'binding force of law' under federal law, and cannot be changed for any reason." Qwest's Br. at 12. These factors, according to Qwest:

> [S]harply focus the Board's, and therefore this Court's, inquiry. Under the ICA, together with all relevant amendments, only two possibilities exist: either the parties agreed to change the DC Power Plant charge, or they did not. If the parties agreed to change the DC Power Plant charge, then the inquiry is at an end, and Qwest must assess the charges as McLeod suggests. However, as discussed in more detail below, since the Board correctly determined, and McLeod does not appear to challenge in this proceeding, that the parties did not intend to change the DC Power Plant charge, the ICA answers the question of what charges should apply for DC Power Plant.

*Id.* at 13.

The Court must first disagree with Qwest's assertion that McLeod does not challenge the IUB's interpretation of the 2004 Amendment in this proceeding. Count III of McLeod's Complaint specifically alleges that the IUB "violated Iowa law by failing to apply the proper standards of contract interpretation ... when interpreting the ICA and the 2004 Amendment." Compl. ¶ 48. McLeod asserts that the IUB failed to harmonize certain ICA provisions with the terms of the 2004 Amendment, and that this failure made the IUB's factual determination that the parties did not intend to alter the way in which power plant was billed arbitrary and capricious. Since the Court agreed with

McLeod's assertion in this regard in the previous section of this Order, it is clear that there is no need to address Qwest's argument further. The Court's finding that the IUB misapplied the principles of contract interpretation in construing the 2004 Amendment necessarily requires a remand of the matter to the IUB for further consideration under the proper standards. Indeed, the IUB's factual finding that the parties did not intend to alter the way in which power plant is charged to McLeod is arbitrary and capricious, given that the finding was made only after application of improper legal standards. Since the IUB could conceivably find, when interpreting the ICA as a whole, that the parties *did* agree to have power plant billed on some method other than "as ordered," the Court would be engaging in pure speculation were it to attempt to delve further into Qwest's arguments that McLeod is simply mounting a collateral attack on IUB approved rates.[21] As Qwest itself admits, "If the parties agreed to change the DC Power Plant charge, then the inquiry is at an end, and Qwest must assess the charges as McLeod suggests."

## 2. Cost differences.

 As this Court previously concluded, the IUB erred in its evaluation of § 251(c) and Iowa Code § 476.100(2), by determining that Qwest's differential treatment of McLeod might not be discriminatory if it were "reasonable." As noted, the proper inquiry is whether Qwest's differential assessment of charges to McLeod with respect to power plant is based on cost differences. If the differential pricing

---

21. The IUB expressed concern over whether it could remedy any possible discriminatory treatment of McLeod by Qwest, noting that it "cannot change the terms of an approved interconnection agreement." Jt. App., Tab 2, at 14. If the IUB were to determine, however, that the parties *did* agree to amend the terms of the ICA with regard to power plant charges by virtue of the 2004 Amendment, there would be no bar to relief, as mutually agreed upon changes to ICAs, approved by the IUB, are permissible under the 1996 Act.

is based on cost differences, Qwest is not discriminating against McLeod, pursuant to § 251(c). If, however, the differential pricing is *not* due to factors reflecting cost differences, Qwest is in violation of the "nondiscrimination" requirement of § 251(c) and McLeod may be entitled to a remedy.[22]

Qwest asserts in its brief that it is "charging cost-based rates for power plant capacity—rates that were approved by the Board in a cost docket and that were clearly described as being imposed on an 'as-ordered' basis." Qwest's Br. at 31. McLeod, on the other hand, asserts that Qwest "never produced any evidence that its disparate treatment was the result of cost differences." McLeod Reply Br. at 21. The Court finds that this is a factual issue that was not fully addressed by the IUB, given that the IUB summarily concluded that there was insufficient evidence to determine whether Qwest had a "reasonable" basis for the disparity. Accordingly, remand of the matter is appropriate so that the IUB may make further factual determinations consistent with the legal standards articulated in this Order. The Court does note, however, that the FCC's Local Competition Order supports a conclusion that the burden rests with Qwest to demonstrate that its differential treatment of McLeod falls within an exception to the stringent discriminatory requirement of § 251(c). *See* Local Competition Order ¶ 313 (discussing the technically infeasible "exception" to the stringent nondiscrimination requirement of § 251(c), *see* n. 5, *supra,* and stating "that the incumbent LEC must prove to a state commission that it is technically infeasible to provide access to unbundled elements, or the unbundled elements themselves, at the

same level of quality that the incumbent LEC provides to itself").

## V. CONCLUSION

The Court finds nothing arbitrary or capricious about the factual findings made by the IUB that are quoted in the block quote on pages 23–24 *supra,* namely that Qwest allocates power plant costs to itself on the basis of List 1 Drain, while allocating power costs to McLeod on the higher List 2 Drain. The Court must deem virtually all other factual determinations of the IUB, however, arbitrary and capricious, given that they were the direct result of the IUB's legal errors, i.e., its failure to apply the proper nondiscriminatory standard under § 251(c) and Iowa Code § 476.100(2), and its failure to apply proper principles of contract interpretation. Furthermore, other important factual determinations, such as whether Qwest's differential treatment of itself and McLeod was the result of cost differences, were never made. Since this Court is sitting as an appellate body, remand for further fact finding consistent with the legal standards articulated herein is the only appropriate remedy. *See Duffie v. Deere & Co.,* 111 F.3d 70, 74 (8th Cir.1997) (finding that when factual findings follow directly from erroneous underlying fact finding, remand is appropriate, as proceeding with legal conclusions in the absence of factual findings "would violate this court's function, which is to review, rather than to make, findings of fact") (citing *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 5 F.3d 1477, 1479 (Fed.Cir.1993) ("This court must review factual findings made by [underlying tribunal]; it may not guess at findings left unmade. Fact-finding by the appellate court is simply not permitted.")).

---

22. Both parties seemed to agree at hearing that the record is insufficient to permit the Court to fashion a remedy, and that remand would be necessary on the matter of the ap-

propriate remedy, even if the Court were able to conclude that Qwest was discriminating against McLeod as a matter of law.

The Court is unaware of any prohibition against remand that might stem from the fact that this case was initially brought before the IUB pursuant to the Iowa "rocket docket." That provision simply provides that a party may file a written complaint with the IUB requesting that the IUB determine an ILEC's compliance with relevant Iowa Code provisions, and that the IUB must "render a decision in the proceeding within ninety days after the date the written complaint was filed." Iowa Code § 476.101(8). The IUB complied with the provisions of the "rocket docket," and rendered its decision in a timely fashion, consistent with the one extension agreed to by the parties. This Court then acquired jurisdiction to review the IUB's determination, pursuant to 47 U.S.C. § 242(e)(6), which authorizes "any party aggrieved" by a state commission decision to bring an action in federal court. *See also Rural Iowa Indep. Tel. Ass'n v. Iowa Util. Bd.*, 362 F.3d 1027, 1030 (8th Cir.2004) ("finding that federal district courts have subject matter jurisdiction 'to determine whether a state administrative agency correctly interprets federal law, in this case the Telecommunications Act and the FCC regulations interpreting the Act.' ") (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643–44, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)). While the IUB does not have independent authority to rehear this case, *see* Iowa Code § 17A.23 ("An agency shall have only that authority or discretion delegated to or conferred upon the agency by law and shall not expand or enlarge its authority beyond the powers delegated to or conferred upon the agency."), the fact that the Court is remanding the matter to the IUB "to resolve factual and legal issues not contemplated at the time" the IUB originally heard the case is sufficient to confer jurisdiction on the IUB. *Iowa Telecomm. Servs., Inc. v. Iowa Utilities Bd.*, 545 F.Supp.2d 869, 882 (S.D.Iowa 2008).

Accordingly, for the reasons stated herein, the matter is hereby REMANDED to the Iowa Utilities Board for further consideration of the case consistent with the terms of this order.

IT IS SO ORDERED.