**IOWA FUEL & MINERALS, INC., Appellant,**

v.

**IOWA STATE BOARD OF REGENTS, and Iowa State University of Science and Technology and State of Iowa, Appellees.**

No. 89–1352.

Supreme Court of Iowa.

June 19, 1991.

John R. Sandre and Pamela D. Griebel of Scalise, Scism, Sandre & Uhl, Des Moines, and Vincent S. Klyn of Gaass, Klyn & Boehlje, Pella, for appellant.

Bonnie J. Campbell, Atty. Gen., and Gordon E. Allen, Deputy Atty. Gen., for appellees.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, NEUMAN and SNELL, JJ.

SNELL, Justice.

This appeal and cross-appeal arose out of a district court judgment awarding plaintiff $218,048.28 for defendants' improper withholding of payments on a coal supply contract, but dismissing plaintiff's remaining claims for breach of contract, negligence, and bad faith. We transferred the case to the court of appeals which, by majority vote, affirmed in part and reversed in part the judgment of the district court. We granted further review and now vacate the decision of the court of appeals and affirm the judgment of the district court.

In 1980 Iowa State University (ISU) solicited bids on a ten-year contract to supply

the university with low-sulphur, washed coal. Bidders responded on university drafted proposal forms which contained the terms of the contract ultimately forged.

ISU granted the contract to Iowa Fuel & Minerals, Inc. (Iowa Fuel) on its bid of 100,000 tons per year of washed industrial stoker coal for $32.28 per ton delivered free on board ($1.68 per million btu's). The ISU contract comprised approximately ninety-five to ninety-seven percent of Iowa Fuel's business, totaling approximately $4,000,000 per year.

The coal price under the terms of the contract was not intended by either party to remain static over the ten-year period. At least two price increases were agreed upon. By June 1983 ISU was paying Iowa Fuel $39.54 per ton ($1.88 per million btu's).

In May 1983 the University of Iowa and the University of Northern Iowa entered into new one-year contracts for their coal needs. Both of those universities paid substantially less for their coal than ISU. In June 1983, the Board of Regents directed ISU to renegotiate its contract with Iowa Fuel. Echoing language in the contract, ISU's purchasing agent sent a letter dated June 2, 1983, to Iowa Fuel stating: "This is to advise you that Iowa State University cannot economically utilize the coal supplied under the [September 19, 1980,] contract and to provide the required thirty (30) days written notification of our intent to renegotiate this contract."

Discussions between the parties ensued in mid-June 1983, resulting in a contract amendment lowering the price to $35.07 per ton ($1.67 per million btu's). The trial court later found the parties had negotiated this price reduction. The trial court further stated that "although [Iowa Fuel] was not happy, the parties did reach an agreement," and held that ISU had not negotiated in bad faith.

At about the same time that ISU sought a price reduction, it noticed that the coal supplied by Iowa Fuel did not meet the btu specifications in the contract. It appears that Iowa Fuel was adjusting its washing process which resulted in cost savings to it, less efficient washing, and lower btu content.

ISU satisfied itself with its own testing methods that the contract btu specifications were not being met and demanded price adjustments as allowed in the contract. The district court, however, found ISU's "method of testing did not follow the requirements of the contract" and held the price adjustments were unjustified. The court of appeals affirmed the district court on this issue.

The relationship finally collapsed in 1986. A July 21, 1986, letter by the director of business affairs at ISU to Iowa Fuel stated: "[Y]ou have failed to meet the quantity levels specified in your coal contract again this year.... [T]hirty (30) days after your receipt of this letter, your contract for the purchase of coal will be cancelled." The letter went into detail on Iowa Fuel's failure to deliver the contractually required quantity of coal in fiscal years 1983–84, 84–85, and 85–86 by approximately twenty-two percent, nineteen percent, and ten percent for those years. Based on Iowa Fuel's failure to deliver the quality and quantity required, ISU terminated the contract in August 1986.

Iowa Fuel steadfastly maintains that no problems with the quantity or quality of its coal would have been encountered had ISU not demanded the price reduction in 1983. Each problem, Iowa Fuel contends, resulted from its being backed into an economic corner by ISU. However, ISU and its codefendants are equally adamant in arguing that the economic corner Iowa Fuel was in was of its own making and that they should not be held accountable for Iowa Fuel's "gossamer" financial condition and myopic business decisions.

Iowa Fuel filed its petition at law on August 15, 1986, alleging breach of contract, negligence, and bad faith against ISU, the State Board of Regents, and the State of Iowa.

Following a trial to the court in September 1988, the trial court, on May 18, 1989, awarded Iowa Fuel $218,048.28 plus interest at the legal rate from August 15, 1986,

for the contract claims involving improper price adjustments. The trial court denied the balance of Iowa Fuel's claims.

Iowa Fuel appealed the adverse portions of the trial court's ruling on August 31, 1989, and defendants cross-appealed the amount of Iowa Fuel's award on September 5, 1989.

On December 27, 1990, the court of appeals affirmed the trial court's award of $218,048.28 to Iowa Fuel and denied defendants' cross-appeal. Separately, Iowa Fuel sought and failed to recover additional damages for a price reduction defendants imposed because of an alleged inability to "economically utilize" the coal supplied. However, this decision was reversed by the court of appeals which awarded Iowa Fuel an additional $807,830 for ISU's breach of contract. Finally, the district court denied all of Iowa Fuel's remaining claims and the court of appeals affirmed. Both parties filed applications for further review which were granted.

 Our scope of review is determined by the nature of the trial proceedings. *Bates v. Allied Mut. Ins. Co.*, 467 N.W.2d 255, 257 (Iowa 1991). This action was filed and tried at law. It is an ordinary action for breach of contract, negligence, and bad faith. Consequently, the court's review is for correction of errors at law. Iowa R.App.P. 4. Where there is substantial evidence in the record to support the trial court's decision, an appellate court is bound by those findings of fact. *See* Iowa R.App.P. 14(f)(1); *Midwest Recovery Serv. v. Wolfe*, 463 N.W.2d 73, 74 (Iowa 1990). An appellate court is not bound, however, by the trial court's application of legal principles or its conclusions of law. *State ex rel. Miller v. Internal Energy Management Corp.*, 324 N.W.2d 707, 710 (Iowa 1982).

I. The contract language in dispute states as follows:

> *TERMINATION:*
> In the event that the coal being supplied becomes unsuitable for combustion either by changes in operation, in equipment or changes in Federal or State regulations, the University shall have the option to terminate the contract or reduce the quantity of coal purchased under the contract on thirty (30) days written notice to the Bidder. If the University *cannot economically utilize* the coal supplied under this contract or in the event that the Bidders proven escalation results in a total price that is unreasonable in view of the price of other comparable coals being offered under contract for periods of time equal to the period remaining under this contract, then this agreement may be renegotiated on thirty (30) days written notice from either party and, failing mutual agreement within a reasonable period of time, the contract shall be terminated upon thirty (30) days written notice following the end of negotiation. Every effort will be made by the University and Bidder to negotiate in good faith a mutually acceptable price for the coal supplied under this contract before giving notice of termination.

(Emphasis added.)

ISU and Iowa Fuel disagree on the meaning of the phrase "cannot economically utilize" but agree that the contract could be canceled upon thirty days notice if negotiations failed. ISU feels that the phrase was included to protect the taxpayers who support this public institution so that ISU could obtain fuel economically. It argues that a plain ordinary meaning is demanded that is unambiguous by which the phrase means given to "frugality" or "thrifty." Iowa Fuel says that the ISU interpretation is tantamount to turning the contract into an "evergreen" contract, where the price is renegotiated every year. This interpretation would not be reasonable, it argues, since it would override the more specific price adjustment provisions in other sections of the contract. Further, Iowa Fuel argues that it would be put at the economic mercy of ISU by such a construction.

 It is the cardinal principle of contract construction that the parties' intent controls; and except in cases of ambiguity, this is determined by what the contract itself says. *See generally* Iowa R.App.P. 14(f)(14); *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988). When a contract is

not ambiguous, it will be enforced as written, *Spilman v. Board of Directors*, 253 N.W.2d 593, 596 (Iowa 1977), but when there are ambiguities in a contract, they are strictly construed against the drafter. *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981); *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 27 (Iowa 1978); *Rector v. Alcorn*, 241 N.W.2d 196, 202 (Iowa 1976). Ambiguity exists when, after application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty exists concerning which of two reasonable constructions is proper. *Berryhill*, 428 N.W.2d at 654; *Gendler Stone Prod. Co. v. Laub*, 179 N.W.2d 628, 631 (Iowa 1970). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970).

■ Because a contract is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. *Fashion Fabrics*, 266 N.W.2d at 26. Under this principle, the phrase "cannot economically utilize" must mean something different from the language following it that refers to how cheaply ISU could obtain coal on the open market. Otherwise, the alternative triggering event for price renegotiation would be rendered superfluous. Furthermore, the second triggering event specifically refers to the conditions under which Iowa Fuel's price could be found unreasonable in light of comparable coals being offered at a lower price for time periods equal to the remaining term of the contract.

■ A second principle of construction applicable here provides that when a contract contains both general and specific provisions on a particular issue, the specific provisions are controlling. *Mopper v. Circle Key Life Ins. Co.*, 172 N.W.2d 118, 126 (Iowa 1969); *Schlosser v. Van Dusseldorp*, 251 Iowa 521, 526, 101 N.W.2d 715, 718 (1960). The contract in this case contains specific and unambiguous provisions regarding when renegotiation could be demanded based on Iowa Fuel's price. We also note the first sentence in the "Termination" section of the contract does not refer to economic concerns at all and, therefore, is not a trigger for price renegotiation. If Iowa Fuel's coal became unsuitable for combustion, ISU could either terminate the contract or buy in reduced quantities. For example, if changes in ISU's coal plant required a conversion process costing thousands of dollars over ISU's budget, the first sentence might apply, even though the coal was suitable for combustion. Since ISU did not demand renegotiation in 1983 because it could not afford Iowa Fuel's coal and because the record is void of any other evidence showing that Iowa Fuel's coal was unsuitable for combustion, the first sentence is inapplicable.

■ A third principle of contract construction provides that a contract will not be interpreted giving discretion to one party in a manner which would put one party at the mercy of another, unless the contract clearly requires such an interpretation. *Midwest Management Corp. v. Stephens*, 291 N.W.2d 896, 913 (Iowa 1980); *Harvey Constr. Co. v. Parmele*, 253 Iowa 731, 741–42, 113 N.W.2d 760, 766 (1962). Based on this principle, Iowa Fuel says it must not be totally at ISU's mercy whenever ISU felt, for whatever reason, it might be able to save Iowa taxpayers' money.

■ A fourth principle of contract construction provides that while words are to be given their ordinary meaning, particular words and phrases in a contract are not to be interpreted in isolation. *Connor v. Thompson Constr. & Dev. Co.*, 166 N.W.2d 109, 112 (Iowa 1969); *Rotterman v. General Mills, Inc.*, 61 N.W.2d 718, 721 (Iowa 1954). ISU relies heavily on the dictionary definitions of "economical" and "utilize" to provide ordinary meanings for these terms as used in the contract. However, defendants' argument places such inordinate emphasis on the adverb "economically" that

they completely lose the verb "utilize" and the object "coal."

■ In construing the language "If the University cannot economically utilize the coal supplied under this contract," the trial court made these findings of fact:

At a time when ISU was paying $1.89 per million BTU's the University of Iowa and the University of Northern Iowa were paying substantially less. The parties negotiated and a reduced price was agreed upon. Although IFM was not happy, the parties did reach an agreement.

While the advantage was with ISU in the negotiations, because it could buy coal cheaper from other suppliers, the Court finds that the claims of IFM that the price reduction was arbitrary and capricious is without merit. The parties negotiated and reached an agreement.

On July 12, 1983 ISU responded to IFM's pricing proposal of $1.71 per million BTU's with a proposal of its own. That is, that IFM supply coal at $1.67 per million BTU's. IFM took this as a "take-it-or-leave-it" offer and because of IFM's position in the market, the offer was accepted. No counterproposal was made by IFM. IFM had invested large sums of money to service this contract. Further, 95% of its business was with ISU.

The Court notes that the contract provided that "Every effort will be made by the University and bidder to negotiate in good faith a mutually acceptable price for the coal ..." Since ISU drew up the contract, the Court concludes that it required both sides to negotiate in good faith and not in bad faith. However, the above scenario falls short of showing ISU negotiated in bad faith; that is to say, ISU did not negotiate in good faith.

The court of appeals held that error by the trial court occurred here because it must have based its decision, by implication, on a construction by ISU that was absurd. That construction assumed that ISU could demand a renegotiation anytime it felt the need to be "thrifty."

Our examination of the record shows that while ISU's argument for an unambig-uous plain meaning is strongly urged, it does not go that far. Neither does the trial court's interpretation. ISU also argues that the "economically utilize" sentence is designed to provide relief to ISU when coal prices have declined as in the present case. The latter part of the sentence on renegotiation of price in the contract only applies to price escalations and is keyed to other comparable coal prices. Although ISU believes the phrase is unambiguous, its own arguments together with those of Iowa Fuel and the court of appeals display considerable ambiguity. As such, there was sufficient reasonableness in the position taken by ISU that it had a contract right to demand a renegotiation of price based on economic utilization.

■ The conference between ISU and Iowa Fuel was found by the trial court to have resulted in a reduced price by negotiation. ISU was found to have not violated the "good faith" provision in the contract.

In this law action, we conclude that there is substantial evidence to support the trial court's findings. Appellate courts are bound by them. *See* Iowa R.App.P. 14(f)(1). Accordingly, we vacate the decision of the court of appeals and affirm the district court on this issue.

■ II. Iowa Fuel further contends that the trial court erred in failing to find that the coal delivered in fiscal year 1985–86 satisfied its contractual obligation. Iowa Fuel also asserts that cancellation of the contract was not warranted even if it was found to be in breach of contract for delivering insufficient quantities.

The record clearly indicates that Iowa Fuel repeatedly failed to provide the quantity and quality of coal for which it had contracted. Iowa Fuel had shortfalls of 21,595 tons, 19,428 tons, and 7,816 tons in the three fiscal years between 1983 and 1986. These were shortfalls of 21.60%, 19.-43%, and 9.77% of the expected amounts.

Iowa Fuel placed considerable evidence in the record in an attempt to excuse its shortfalls and to show compliance with the contract. Iowa Fuel attempts to show that the parties had agreed to allow the supply

to vary by ten percent of the expected amount. The district court found that Iowa Fuel failed in its burden to show the termination was wrongful and we agree. ISU had a right to terminate the contract for failure to supply the stipulated quantities.

Iowa Fuel also contends that its shortfalls were excused. Although the trial court alluded to the possibility that the "shortcomings by [Iowa Fuel] may have been excused, and indeed it was for several years," it obviously found that strict performance had not been excused. Further, the record indicates that ISU remained concerned about the quantity of coal Iowa Fuel was supplying throughout the 1983–86 period. Substantial evidence supports the trial court on this issue.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.