**RYKO MANUFACTURING CO.,**
**Plaintiff/ Counterclaim**
**Defendant,**

v.

**NATIONWIDE WASH SYSTEMS,**
**INC., Defendant/ Counterclaim**
**Plaintiff.**

No. 4:09–cv–00182.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 8, 2010.

Jan Mohrfeld Kramer, Smith & Kramer PC, Des Moines, IA, for Plaintiff/Counterclaim Defendant.

R. Jeffrey Lewis, Kimberly Pieters Knoshaug, Lewis Webster Van Winkle & Knoshaug LLP, Des Moines, IA, for Defendant/ Counterclaim Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is Nationwide Wash Systems, Inc.'s ("Nationwide") Motion for Partial Summary Judgment, filed June 10, 2010. Clerk's No. 12. Ryko Manufacturing Co. ("Ryko") filed a Resistance to Nationwide's Motion on July 13, 2010. Clerk's No. 15. Nationwide filed a Reply on August 2, 2010. Clerk's No. 18. Though Nationwide has requested a hearing, the Court does not believe oral argument would substantially aid it in resolving the present motion. Accordingly, the matter is fully submitted.

## I. PROCEDURAL BACKGROUND

On May 5, 2009, Ryko filed a two-count Complaint against Nationwide. Clerk's No. 1. In the first count of the Complaint, Ryko alleges that Nationwide failed to pay for goods and merchandise purchased from Ryko on account. *See id.* In the second count of the Complaint, Ryko seeks declaratory judgment on the question of whether Ryko owes Nationwide "rebates" (also referred to as "commissions") under the terms of a written, non-exclusive Distributorship Agreement, which the parties entered into on January 1, 2008 (the "2008 Agreement"). *Id.* Nationwide filed an Answer to Ryko's Complaint on June 12, 2009. Clerk's No. 4. On June 26, 2009, Nationwide filed a six-count Counterclaim against Ryko, asserting that Ryko is liable for: 1) breach of contract; 2) breach of the duty of good faith; 3) breach of oral contract; 4) open account; 5) account stated; and 6) unjust enrichment. Clerk's No. 5.

In the present Motion for Partial Summary Judgment, Nationwide contends that there "are two contractual payments that Ryko owes to Nationwide as a matter of law under the terms of the [2008 Agreement]." Def.'s Mot. at 2. First, Nationwide contends that Ryko has failed to pay it certain "rebates" owed under the terms of the 2008 Agreement. *Id.* Second, Nationwide contends that Ryko has failed to credit it with a $25,000.00 payment, pursuant to paragraph 21 of the 2008 Agreement. *Id.* Ryko strongly opposes Nationwide's claims of entitlement to partial summary judgment, for reasons to be discussed in detail, *infra.*

## II. FACTUAL BACKGROUND

Ryko is an Iowa corporation engaged in the business of manufacturing and selling motor vehicle washing equipment. Nationwide's Statement of Material Facts (hereinafter "Def.'s Facts") ¶¶ 2–3. Nationwide is a Minnesota corporation engaged in the installation and service of motor vehicle car wash systems. *Id.* ¶¶ 1, 4. Ryko and Nationwide have had a business relationship dating back to 1979, whereby Nationwide operated as a Ryko Distributor, i.e., Nationwide would purchase equipment from Ryko at distributor prices, and then resell that equipment for customers to use in automatic car washes.[1]

1. Nationwide is a closely-held corporation, started in 1979 by the father of Nationwide's current president, Valerie Adams Kreager.

*Id.* ¶ 11; Ryko's Statement of Additional Material Facts (hereinafter "Pl.'s Facts") ¶ 2. Over the years, the parties' business relationship has been governed by various contracts. Pl.'s Facts ¶ 12. Though the present lawsuit directly concerns only the 2008 Agreement, several prior aspects of the parties' business relationship are relevant.

According to Nationwide, in 1990, after seven years of meetings and social contacts, Valerie Adams Kreager ("Kreager") successfully solicited the corporate account of Holiday Companies, Inc. ("Holiday").[2] Def.'s Facts ¶¶ 14–15. Pursuant to the parties' various agreements, including the 2008 Agreement, Holiday was a "national account,"[3] meaning that Ryko products were sold to Holiday directly by Ryko, and not through a distributor such as Nationwide. Pl.'s Facts ¶ 4. Though Nationwide was prohibited from selling directly to Holiday, the parties had, over the years, an agreement whereby Ryko would pay Nationwide "rebates" or "commissions" related to sales to certain national account customers like Holiday. *Id.* ¶ 10.

From April 2006 to December 31, 2007, the parties' relationship was governed by a Distributorship Agreement (the "2006 Agreement"). *Id.* ¶ 13. At the time the parties entered into the 2006 Agreement, there existed a dispute between Ryko and Nationwide related to Nationwide's account with Ryko for car wash equipment parts, and related to Nationwide's claims for payments alleged to be due from Ryko for performing warranty services. *Id.* ¶ 14. The dispute was resolved by including in the 2006 Agreement a $25,000.00 credit to Nationwide's parts account, in full settlement of all outstanding disputes between Nationwide and Ryko.[4] *Id.* ¶ 15. In December 2007, while the 2006 Agreement was in effect, Holiday purchased ten Ryko car wash systems, prepaying the price of the systems in order to obtain additional pricing discounts. Def.'s Facts ¶ 16. Throughout the spring and summer of 2008, Nationwide installed the car wash systems at various Holiday locations in the State of Minnesota. *Id.* Following Nationwide's installation of the equipment, Ryko paid rebates to Nationwide, pursuant to the terms of the 2006 Agreement. *Id.* ¶ 17.

On January 1, 2008, Nationwide and Ryko entered into the 2008 Agreement, whereby Nationwide again agreed to be a distributor of Ryko car wash equipment. *Id.* ¶¶ 5–6. The 2008 Agreement was substantially identical to the 2006 Agreement, and though the parties did not discuss or negotiate the matter, the 2008 Agreement contained the same provision providing for a $25,000.00 credit to Nationwide in settlement of all disputes then existing between the parties. Pl.'s Facts ¶¶ 18–19. Ryko contends that there were no disputes between the parties at the time they entered into the 2008 Agreement, and that the $25,000.00 credit provision was included by mistake. *Id.* ¶ 19. Nationwide counters that the inclusion of the provision in the 2008 Agreement demonstrates the intent of the parties to include it, though Nationwide admits that, prior to the filing of its counterclaim in this case, it had never

---

Def.'s Facts ¶ 10. Kreager purchased the business from her parents in 1990. *Id.* ¶ 12. She has been its president since 2001 and is currently its sole stockholder. *Id.* ¶ 13.

2. Ryko contends that the efforts of Ryko employees also contributed significantly to the signing of Holiday as a corporate account. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 14–15.

3. "National account" customers were large customers with multiple locations. Pl.'s Facts ¶ 5.

4. Ryko, in fact, credited Nationwide with the $25,000.00 agreed-upon credit on April 12, 2006. Pl.'s Facts ¶ 16.

claimed that Ryko owed it a $25,000.00 credit under the terms of the 2008 Agreement.[5] *Id.* ¶ 20; Def.'s Resp. to Pl.'s Facts ¶ 18. Though the 2008 Agreement was set to expire on December 31, 2008, the parties extended it until March 31, 2009. Def.'s Facts ¶¶ 7–8. Beginning March 31, 2009, however, Nationwide declined to enter into any further contractual arrangements with Ryko. *Id.* ¶ 9.

In May 2008, while the 2008 Agreement was in effect, Holiday again entered into an Equipment Supply Agreement with Ryko for the purchase of Ryko car wash systems. *Id.* ¶ 18. Ryko provided Nationwide with a copy of that agreement, under which Holiday pre-paid Ryko for ten car wash systems in December 2008. *Id.* ¶¶ 18–19. Holiday entered into a separate agreement with Nationwide to install the ten car wash systems at Holiday locations in Minnesota, North Dakota, and Michigan, and to provide warranty service on them. *Id.* ¶¶ 20–22, 24; Pl.'s Resp. to Def.'s Facts ¶ 20. Nationwide completed installation on nine out of ten of the car wash systems by December 2009. Def.'s Facts ¶¶ 23–24. Despite the fact that the parties' contract had expired several months previously, after installing the car wash systems, Nationwide sent Ryko invoices for "rebates" it claimed Ryko owed

it in relation to Holiday's purchase of the car wash systems. *Id.* ¶ 25. Ryko has refused to pay the rebates, taking the position that no rebates are owed to Nationwide since the 2008 Agreement expired prior to Nationwide's installation of the car wash systems. *Id.* ¶ 25 (second).[6]

## III. STANDARD FOR SUMMARY JUDGMENT

■ The term "summary judgment" is something of a misnomer.[7] *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive. *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[8]

5. Nationwide does, however, assert in its Reply brief: "While Ryko contends that [the $25,000.00 credit provision] related to a [2006] accounting issue[,] Nationwide takes the position that Ryko had ongoing accounting problems." Def.'s Reply at 7.

6. Nationwide's facts are incorrectly numbered, containing two each of numbers 25, 26, and 27.

7. Judge D. Brock Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." Hornby, D. Brock, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273, 284 (Spring 2010).

8. Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

*Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

■ Federal Rule of Civil Procedure 56(b) provides that "[a] party against whom relief is sought may move at any time ... for summary judgment on all or part of the claim." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriately granted when the record, viewed in the light

most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(e)(2). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at

247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

■ Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the job of a court is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 *and* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2712 (3d ed. 1998)). It is the responsibility of the parties to provide the evidence necessary for this assessment. *Id.* at 921.

## IV. ANALYSIS

In its Motion for Partial Summary Judgment, Nationwide asserts that it is entitled to judgment as a matter of law on two issues. First, Nationwide argues that it clearly entitled to "rebates" on Holiday's purchase of ten car wash systems from Ryko in December 2008. Second, Nationwide contends that there is no genuine issue of material fact as to whether Ryko owes it a $25,000.00 credit, pursuant to the terms of the 2008 Agreement. The Court will evaluate each claim in turn.

### A. *Rebates*

The first dispute between the parties is Nationwide's claimed entitlement to rebates under the 2008 Agreement. Exhibit A–3 of the 2008 Agreement provides:

> Distributor would continue to provide service and sales to Holiday Stationstores, Fleet Farm and Speedway SuperAmerica (SSA) where Distributor would receive commissions or rebates on sales to each for the term of the agreement so long as each customer remains satisfied with the Distributor provided sales and service for that customer. If a customer is not satisfied and does request that Distributor discontinue providing sales and service for that customer, Distributor will be notified in writing by Ryko if customer makes the dissatisfaction statement to Ryko, stating the reasons for the dissatisfaction. Provided the customer is willing to allow a thirty (30) day period in which the Distributor can satisfy the customer, the Distributor will be given a thirty (30) day period (cure period) in which to satisfy the customer and Ryko shall facilitate and provide Distributor with a reasonable opportunity to exert good faith efforts to alleviate that customer's dissatisfaction. Continuation of rebates or commissions for each of these customers shall be dependent on Distributor maintaining its ability to provide adequate sales and service capabilities for these customers. If any of these customers decide to not have Distributor provide sales or service to that customer the rebate or commission will be discontinued after the cure period, if allowed, has ended, otherwise at the time of notice and in the event Distributor fails to alleviate that customer's dissatisfaction and Distributor's annual sales quota will be decreased correspondingly.

Def.'s App. at 16.

With respect to the timing of rebate payments, the 2008 Agreement, Exhibit

D–1 pertaining to "National Account Policies," provides:

> The procedure for collection of payment from National Account Customers will be that Ryko Manufacturing Company, upon shipment of merchandise, will invoice the National Account Customer. Upon receipt of payment in full for all invoiced items, Ryko will disburse to the Distributor, within a reasonable period of time, the applicable Distributor commission for that sale. Once the equipment is installed, Ryko has been paid and the Installation Completion Form has been received by Ryko, the full commission will be disbursed to the Distributor within a reasonable time.

Def.'s App. at 25. Nationwide contends that this contract language contains a conflict within a conflict, i.e., either Ryko is supposed to pay the distributor the applicable commission within a reasonable period of time after receiving payment in full from a national customer, or Ryko is to pay the distributor the applicable commission within a reasonable time after receiving payment from the national customer *and* after receiving an Installation Completion Form. Def.'s Br. at 5–6. According to Nationwide, Ryko owes it rebates under either clause because Holiday has paid in full for the car wash systems it purchased in December 2008, and because Nationwide has completed installation of the car wash systems and has provided Ryko with Installation Completion Forms.[9] *Id.* at 6.

Ryko counters that, since the "equipment was installed after the Agreement terminated … no rebates were due." Pl.'s Br. at 4. Specifically, Ryko points to the language of Exhibit A–3 which provides that Nationwide was only entitled to "receive commission or rebates on sales [to Holiday] *for the term of the agreement,*"

and only so long as Holiday remained satisfied. *Id.* at 3–4 (citing the 2008 Agreement, Ex. A–3, Def.'s App. at 16, emphasis added). Ryko further points out that the course of conduct between the parties during the term of the 2008 Agreement, and during the term of the substantially identical 2006 Agreement, demonstrates that the parties understood that Ryko was only to be paid rebates for national account customers after installation of equipment was completed and after Nationwide provided Ryko with an Installation Completion Form. *Id.* at 5. Ryko additionally points out that Nationwide has ignored a more specific provision of the 2008 Agreement, which governs situations where equipment cannot be immediately installed:

> In the event that the location [where the car wash equipment is to be installed] is not ready for the Ryko Products to be installed disbursement of commissions shall be as follows:
>
> 1. Within a reasonable time after Ryko has been paid for the invoiced products by the National Account Customer Ryko shall pay twenty percent (20%) of the Distributor's commission for that sale to cover unloading and handling charges.
>
> 2. The balance of the commission due shall be paid by Ryko to the Distributor within a reasonable time after installation has been completed and Ryko has received a completed Installation Form for that location.

Pl.'s Br. at 4; Def.'s App. at 26.

The question of when, and under what conditions, Ryko was required to pay rebates to Nationwide is a matter of contract interpretation. Contract interpretation is the process of ascertaining "the

---

9. Though Nationwide continually asserts that Ryko owes it rebates for all ten car wash systems, it does not dispute that only nine of the ten car washes have actually been installed.

meaning of the words used by the parties." [10] *Pillsbury Co., Inc. v. Wells Dairy, Inc.,* 752 N.W.2d 430, 435 (Iowa 2008) (citing *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.,* 266 N.W.2d 22, 25 (Iowa 1978)). "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract." *Id.* (citing *Walsh v. Nelson,* 622 N.W.2d 499, 503 (Iowa 2001)). This is because, under the general rules of contract interpretation, the intent of the parties in creating the contract controls. *See Smith Barney, Inc. v. Keeney,* 570 N.W.2d 75, 78 (Iowa 1997). Unless there is an ambiguity, however, the intent of the parties is determined by what the contract itself says. *Id.* (citing *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 862 (Iowa 1991)). "A contract is to be interpreted as a whole, and it is assumed in the first instance that no part of it is superfluous." *Id.* (citing *Iowa Fuel,* 471 N.W.2d at 863). "The interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect." *Id.* (citing *Iowa Fuel,* 471 N.W.2d at 863).

■ When interpreting a contract, the Court must engage in a two-step process. *Walsh v. Nelson,* 622 N.W.2d 499, 503 (Iowa 2001). "First, from the words chosen, a court must determine 'what meanings are reasonably possible.'" *Id.* (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). "In so doing, the court determines whether a disputed term is ambiguous." *Id.* The question of whether a term is ambiguous will not be determined by the mere fact that the parties disagree about its meaning. *Id.* (citing *Hartig Drug Co. v. Hartig,* 602 N.W.2d 794, 797 (Iowa 1999)). Rather, a

term is ambiguous if, "'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.'" *Id.* (quoting *Hartig Drug Co.,* 602 N.W.2d at 797). Second, if the Court identifies an ambiguity in the relevant contact terms, it must choose which meaning the parties intended. *Id.* "In ascertaining the meaning of contractual terms extrinsic evidence is admissible as an aid to interpretation when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain." *Dickson v. Hubbell Realty Co.,* 567 N.W.2d 427, 430 (Iowa 1997) (internal quotation omitted). When, however, "extrinsic evidence is necessary to resolve the meaning of ambiguous language, 'a question of interpretation arises which is reserved for the trier of fact.'" *Rick v. Sprague,* 706 N.W.2d 717, 723 (Iowa 2005) (quoting *Walsh,* 622 N.W.2d at 503).

■ Applying the principles of contract interpretation to the 2008 Agreement's rebate provisions, the Court finds that Nationwide's entitlement to rebates from Ryko under the 2008 Agreement cannot be determined as a matter of law. Had the parties continued in their contractual arrangement, it appears clear that, under any reading of the various rebate timing provisions, Nationwide would have been entitled to receive rebates, at the latest, within a reasonable time after Holiday had paid for the units *and* after Nationwide provided Ryko with Installation Completion Forms for the units. *See* Def.'s App. at 25–26 (Contract, Ex. D–1). Nationwide and Ryko did not, however, continue their long-standing contractual arrangement after March 31, 2009, and nothing in the

---

10. Contract interpretation must be distinguished from contract construction, which is the process of determining the legal effect of

contract terms. *See Pillsbury,* 752 N.W.2d at 435–36 (citations omitted).

timing provisions of the 2008 Agreement clearly demonstrates that the parties ever contemplated what rebates would be owed to Nationwide in a situation where car wash units were sold during the term of the 2008 Agreement, but installed after its expiration.

At best, the Court has three relevant considerations from which to discern the parties' intent in such a situation: 1) the conflicting timing provisions which provide that payment of rebates must be made either after payment in full is received or after Installation Completion Forms are submitted; 2) the provision in Exhibit A–3 of the contract providing that "Distributor would receive commissions or rebates on sales to [national accounts] *for the term of the agreement* so long as each customer remains satisfied with the Distributor provided sales and service for that customer"; and 3) the fact that rebates were previously paid by Ryko to Nationwide only after the submission of Installation Completion Forms.[11] Considering these factors in conjunction, the Court believes more than one reasonable inference can be drawn with respect to Nationwide's entitlement to rebates. That is, when considering *all* of the relevant contractual provisions, along with the extrinsic evidence of the parties' prior course of conduct, three reasonable inferences may be drawn: 1) rebates were owed to Nationwide for equipment sold, but not installed prior to the expiration of the 2008 Agreement; 2) rebates were owed to Nationwide only for equipment sold *and* installed prior to the expiration of the 2008 Agreement; or 3) rebates were owed to Nationwide for equipment sold during the term of an agreement and installed outside the term of the agreement only when another contract was in force between the parties. Since the extrinsic evidence in the case does not dispel any potential ambiguity, the intent of the parties in the situation now under consideration is appropriately left for the trier of fact to decide.

### B. *Credit*

Nationwide next contends that it is entitled to a $25,000.00 credit to its account, in accordance with the following provision in the 2008 Agreement:

> Company will provide Distributor with a $25,000.00 credit to settle all current disputes as to Distributor's accounts and any claims Distributor has made regarding warranty services or any other issue or claim between the Company and the Distributor. By crediting the Distributor, Company makes no admission or agreement as to the sufficiency, accuracy or liability for any such claims or issues. The Company provides this credit for settlement purposes only so that these matters are behind the parties. Any future claims along these lines would be handled on a case-by-case basis and such claims will be reasonably entertained by Ryko.

Def.'s App. at 8. Nationwide contends that the plain language of the contractual provision evidences the parties' intent that Ryko pay Nationwide $25,000.00 under the terms of the 2008 Agreement. Ryko counters that the provision was developed for use in the 2006 Agreement, and that it was never intended by either party to be included in the 2008 Agreement. In support of this assertion, Ryko contends that there "was no current dispute" between the parties at the time they entered into the 2008 Agreement. Pl.'s Facts ¶ 17. Nationwide denies Ryko's assertion that there was no "current dispute" between the parties at the time of negotiating the 2008 Agreement, pointing to its own assertion that

---

11. The Court also notes that Exhibit D–1 of the 2008 Agreement specifically provides that "Ryko reserves the right to change prices, commissions, or the method of payment of commissions at any time." *See* Def.'s App. at 25.

"Nationwide has never received a $25,000 credit from Ryko." *See* Def.'s Resp. to Pl.'s Facts ¶ 17; Def.'s Facts ¶ 29. Nationwide, however, admits that on April 12, 2006, a "credit memo was issued providing Nationwide with the agreed upon credit to its parts account," in accordance with the 2006 Agreement. Thus, it is unclear to the Court why Nationwide contends the parties actually intended to include the $25,000.00 credit provision in the 2008 Agreement. At best, it appears that Nationwide is asserting it should receive the $25,000.00 credit regardless of the parties' intent, because if a mistake was made, it was Ryko's unilateral mistake. *See* Def.'s Reply at 6–7 (citing *Employers Mut. Cas. Co. v. United Fire & Cas. Co.*, 682 N.W.2d 452, 454 (Iowa Ct.App.2004), for the proposition that "a unilateral mistake by one party will not release that party from its obligation under the contract absent fraud, misrepresentation, or other misconduct").

The Court finds Nationwide's argument unconvincing. The dispute over the credit is not, in the Court's opinion, an issue of "unilateral mistake." Rather, the dispute raises an issue of equitable reformation, which was discussed by the Iowa Supreme Court in *State of Iowa, Department of Human Services ex rel. Palmer v. Unisys Corp.*:

> When the understanding of the parties was not correctly expressed in the written contract, equity exists to reform the contract to properly express the intent of the parties. *Akkerman v. Gersema*, 260 Iowa 432, 149 N.W.2d 856, 859 (1967). Furthermore, it normally makes no difference if the mistake is mutual or unilateral. This is because the operative mistake is the belief of the parties that the contract correctly expresses the agreement. Thus, reformation is needed to give effect to the intention of the parties and to prevent unjust enrichment. Without reformation, the party benefited by this mistake would receive a benefit not provided for under the agreement which the written contract was meant to express.

637 N.W.2d 142, 151 (Iowa 2001) (some internal citations omitted). Obviously, the inverse of the situation in *Palmer* is at issue in this case, i.e., if the $25,000.00 credit clause was *not* intended by the parties to be included in the 2008 Agreement, enforcement of the clause would allow Nationwide to be unjustly enriched by receiving a benefit that the written contract was *not* meant to express.

 As discussed above, the purpose of contract interpretation is to ascertain the intent of the parties at the time of entering into the contract. *Pillsbury Co., Inc.*, 752 N.W.2d at 436. In this case, the intent of the parties with regard to the inclusion of the $25,000.00 credit provision is clearly in dispute. Extrinsic evidence of the parties' intent, including evidence tending to show that the parties had "current disputes" that would warrant the inclusion of the provision in the 2008 Agreement, will certainly be required to determine the matter, given Ryko's assertion that the provision was mistakenly included, and given Nationwide's assertion that it was not. Accordingly, summary judgment in favor of Nationwide on the credit issue is not warranted on the current record.

## V. CONCLUSION

For the reasons stated herein, the Court finds that Nationwide has failed to carry its burden to demonstrate the absence of genuine issues of material fact, both as to the rebate issue and the credit issue. Accordingly, Nationwide's Motion for Partial Summary Judgment (Clerk's No. 12) is hereby DENIED.

IT IS SO ORDERED.