# IN THE COURT OF APPEALS OF IOWA

No. 17-1192
Filed November 21, 2018

**DWAYNE SUNBERG and PATRICIA SUNBERG,**
    Plaintiffs-Appellants,

**vs.**

**AUDUBON COUNTY, IOWA, AUDUBON COUNTY BOARD OF SUPERVISORS, and AUDUBON COUNTY SOIL AND WATER COMMISSION,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Audubon County, Greg W. Steensland, Judge.

The plaintiffs appeal from the district court's dismissal of their lawsuit, which sought damages for failure to properly maintain a soil and water conservation structure located on their property. **AFFIRMED.**

Jeremy B. Hahn and Deborah L. Petersen of Petersen Law PLLC, Council Bluffs, and James C. Webering of Webering Law Offices, P.C., Glenwood, for appellants.

Robert M. Livingston of Stuart Tinley Law Firm, LLP, Council Bluffs, for appellees Audubon County, Iowa and Audubon County Board of Supervisors.

Thomas J. Miller, Attorney General, and David L. Dorff, Assistant Attorney General, for appellee Audubon County Soil and Water Commission.

Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

Dwayne and Patricia Sunberg initiated a lawsuit against Audubon County, the Audubon County Board of Supervisors, and the Audubon County Soil and Water Commission (collectively, "the defendants") seeking damages for the defendants' alleged failure to properly maintain a soil and water conservation structure located on the Sunbergs' property. On appeal, the Sunbergs claim the defendants have a statutory, contractual, and common law duty to maintain the structure by removing accumulated silt or taking action to reduce the rate the silt would accumulate. They assert the district court was wrong to conclude the defendants did not owe a duty to the Sunbergs to maintain the structure or, alternatively, even if the defendants did owe a duty to maintain, their inaction allowing the accumulation of silt was not a breach of the duty to maintain.

**I. Background Facts and Proceedings.**

Following a catastrophic flood in 1958, the Soil Conversation Services—now known as the Natural Resources Conservation Service[1]—entered into an operation and maintenance agreement with the Audubon County Soil and Conservation District (the district) and the Audubon County Board of Supervisors (the board). The agreement "establish[ed] responsibilities for operation and maintenance" to works of improvement "to be installed in the David's Creek Watershed." The district agreed to "take necessary steps to insure that structures will function as intended" and "[t]ake all other necessary steps to insure that the works of improvement are permitted to function in the manner for which they were

---

[1] The National Resources Conservation Service (NRCS) is a federal agency within the United States Department of Agriculture.

designed, and are operated in accordance with any applicable State law." The board agreed it was "responsible for the operation and maintenance of the works of improvement," including "tak[ing] necessary steps to insure that structures will function as intended." Additionally, the board specifically agreed to:

> Perform, in accordance with any applicable State laws, all maintenance needs indicated by inspections and report thereof within the time limits specified, if any, in such manner as not to damage the works of improvement in any way. Maintenance may include, but not be limited to, the following:
> a. Remove and dispose of debris.
> b. Topdress vegetated embankments, spillways, borrow areas, structural waterways and diversions with needed applications of plant food.
> c. Refill, smooth and vegetate rills on embankments, spillways, borrow areas, structural waterways, and diversions.
> d. Repair damaged tile lines and tile outlets.
> e. Remove obstructions in channels downstream of structures and clean out drainage ditches.
> f. Repair damaged work such as concrete structures or rusted out CMP spillways.
> g. Other maintenance works as indicated in inspection reports.

Part of the Sunbergs' farmstead lies within the David's Creek Watershed, and one of the structures listed in the operation and maintenance agreement— structure 28-3—would ultimately be constructed on the Sunbergs' property.

In December 1971, the Sunbergs executed a written easement covering fifty-seven acres of their farmstead in Audubon County. The easement allowed the district and the board to access the land in order for

> construction, operation, maintenance and inspection of the following described works of improvement to be located on the above described land; for the flowage of any water in, over, upon or through such works of improvement; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such works of improvement.

The improvement at issue, structure 28-3, was meant to provide flood detention, stabilize the grade of the ditch, and to conserve the soil.

Structure 28-3 included an earthen dam, a principle spillway, a permanent pool or sediment pond, and an emergency spillway. In completing the structure, the defendants constructed an earthen dam; installed a brush rack, draw-down tube, and riser drainers; and did grade work on the Sunberg's property. Pursuant to the design parameters used for the structure, 28-3 was expected to store 73.7 acre feet of sediment below the crest and 13.2 acre feet of sediment above it, for a total of 86.9 acre feet of sediment held behind the dam. Construction on structure 28-3 was completed in September 1975.

According to the testimony of Dwayne Sunberg, the structure originally worked largely as he expected, and a 6.6 acre pond[2] was created in the area near the dam. The Sunbergs stocked the pond with fish, and they enjoyed both the recreation and the aesthetics the pond afforded them. The Sunbergs were originally able to farm up to the ditch—which had been a natural feature of the land—that acted as a drainage channel to the pond area. Then, in 1999, the pond "silted in," and the fish died. By the time the Sunbergs filed the present lawsuit, in 2013, the pond no longer existed. Instead, the area where the pond was formerly located was a boggy area with weeds and trees growing in it; the space was not farmable.

The Sunbergs sued the defendants, alleging the defendants breached their duty to maintain structure 28-3 because they failed to take any steps to prevent

---

[2] Dwayne testified the pond was supposed to be 8.8 acres, but it never reached that size.

the pond from filling with sediment or any corrective actions after the silting in occurred.  The Sunbergs asked for damages in excess of $225,000 to recreate the pond.

Following a three-day bench trial, the district court dismissed the Sunbergs' petition, ruling, "[The] Sunbergs have failed to show that defendants were negligent or breached any contract because there is no evidence suggesting that sediment had to be periodically removed from Site 28-3."

The Sunbergs appeal.

## II. Standard of Review.

We review cases tried at law for correction of errors at law.  *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 179 (Iowa 2010).  "Under this standard of review, the trial court's findings carry the force of a special verdict and are binding if supported by substantial evidence."  *Id.*  However, we are not bound by the trial court's legal conclusions.  *Id.*

## III. Discussion.

The Sunbergs assert the defendants have an ongoing duty to maintain structure 28-3.  They offer alternative theories to support this claim.

**1. Statutory Duty.**  First, the Sunbergs maintain the defendants have a statutory duty to maintain structure 28-3.  The Sunbergs rely upon Iowa Code chapters 161A and 161E (2013) to support their argument.  Chapter 161A is titled "Soil and Water Conservation," and section 161A.2 declares

> the policy of the legislature to integrate the conservation of soil and water resources into the production of agricultural commodities to insure the long-term protection of the soil and water resources of the state of Iowa, and to encourage the development of farm management and agricultural practices that are consistent with the

capability of the land to sustain agriculture, and thereby to preserve natural resources, control floods, prevent impairment of dams and reservoirs, assist and maintain the navigability of rivers and harbors, preserve wildlife, protect the tax base, protect public lands and promote the health, safety and public welfare of the people of this state.

Iowa Code section 161E.5, found within the chapter entitled "Flood and Erosion Control," provides that when "construction of projects have been completed . . . only the cost of maintenance may be assumed by the county." Section 161E.7 states, "Any flood or soil erosion control, flood prevention, or the conservation, development, utilization, and disposal of water, projects built on private land with federal or other funds when dedicated to the county use, shall be maintained in the same manner as its own county-owned or controlled property."

Even if we understood these code sections to impose a statutory duty on the defendants to maintain structure 28-3, the violation of the statutory duty would not provide the Sunbergs with a cause of action. *See Estate of McFarlin v. State*, 881 N.W.2d 51, 56 (Iowa 2016) ("Not all statutory violations give rise to a private cause of action. A private statutory cause of actions exists 'only when the statute, explicitly or implicitly, provides for such a cause of action.'" (citation omitted)). None of the provisions cited by the Sunbergs expressly create a private right to sue, and the Sunbergs have not argued the legislature intended to create a private right to sue. *See id.* at 57 (applying the four-factor test to determine whether an implied private right of action exists and finding it did not because "the plaintiffs must satisfy all four factors" and failed to establish one of the four). Our supreme court has "repeatedly declined to find an implied private right to sue under general regulatory statutes." *Id.* at 58.

Even if the statutes imposed a duty on the defendants to maintain structure 28-3, the Sunbergs may not rely upon that statutory duty as a basis for a private cause of action.

**2. Common Law Duty.** Next, the Sunbergs maintain the defendants have a common law duty to maintain structure 28-3. They rely on case law, which provides, "[E]asement holders have all such rights as are incident or necessary to the reasonable and proper enjoyment of their easement. However, every benefit has a corresponding burden. Accordingly, easement holders not only have the right but an obligation to repair and maintain their easement as necessary." *Koenigs v. Mitchell Cty. Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003) (citation omitted). Here, the district court determined that the general rule was not applicable, as the "the parties have a contract dictating the extent of the [defendants'] easement and consequent obligations. As such, the issue of the [defendants'] duty to maintain [the structure] is entirely one of contract." *Id.*

The Sunbergs argue the facts of the present case are distinguishable from those in *Koenigs.* But those differences do not prevent us from recognizing that the parties' written contract delineating their rights and duties as relates to the easement usurps the common law duty of easement holders to repair and maintain. *See id.* ("*Absent an agreement to the contrary*, the general rule is . . . ." (emphasis added)). While the defendants may have a duty to maintain structure 28-3, it is not a common law duty. *See Thompson v. JTTR Enviro, L.L.C.*, No. 16-1610, 2017 WL 3065159, at *3 (Iowa Ct. App. July 19, 2017) (noting that because the parties entered into a written contract that contains terms agreed to by the parties and "[e]asements are subject to ordinary contract principles," "it is our

responsibility on appeal—and the district court's duty below—to consider the terms of *this* contract and the parties agreed-upon responsibilities under its terms").

**3. Contractual Duty.** Finally, we consider whether the defendants have a contractual duty to maintain structure 28-3. The Sunbergs rely on both the written easement and the operating and maintenance agreement—signed between the NRCS, the district, and the board—as the bases for their claim.

The district court ruled the defendants did not have a contractual duty to maintain the structure because the Sunbergs were not a party to the operating and maintenance agreement and thus could not rely on it and the easement permitted the defendants to maintain the structure but did not require it.

In their appellate briefs, the defendants concede that the operating and maintenance agreement establishes an ongoing maintenance obligation on the defendants. However, they assert that duty is only owed to the NRCS and the Sunbergs may not rely on a contract they are not a party to as a basis for their cause of action. *See Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 107 (Iowa 1995) ("Whether a party is 'in privity' with another party depends on whether they are parties to a contract. If the parties have contracted with each other, they are in privity. If they have not, they are not in privity." (citation omitted)); *see also Privity*, *Black's Law Dictionary* (10th ed. 2014) (defining "privity of contract" as "[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so"). The Sunbergs argue the operating and maintenance agreement was entered into before they signed the easement, they were aware of the agreement, and they relied upon the defendants' promise of maintenance within the agreement when they entered into

the easement with the defendants. But the Sunbergs have provided no authority to support the proposition that they may sue based on the breach of a contract to which they are not a party. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.") Thus, we do not consider the operating and maintenance agreement in determining whether the defendants had a duty to the Sunbergs to maintain structure 28-3.

Next, we consider whether the written easement imposes a duty to maintain the structure. The easement expressly grants the defendants "a permanent and perpetual easement in, over and upon" a specific portion of the Sunbergs' property

> [f]or, or in connection with the construction, operation, maintenance and inspection of the following described works of improvement to be located on the above described land; for the flowage of any water in, over, upon or through such works of improvement; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such works of improvement.

"It is the cardinal rule of contract construction that the parties' intent controls; and except in cases of ambiguity, this is determined by what the contract itself says." *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991). "When a contract is not ambiguous, it will be enforced as written." *Id.* at 862–63. "Ambiguity exists when, after application of pertinent rules of interpretation to the face of the instrument, genuine uncertainty exists concerning which of two reasonable constructions is proper." *Id.* at 863. One principle of contract construction is that contracts are to be interpreted as a whole. *See id.*

Here, the district court found that the language of the easement was not ambiguous and ultimately ruled:

> The language of the easement is permissive and not mandatory. The easement merely allows the defendants to construct, operate, maintain and inspect the structure for the temporary or permanent flowage, storage, or detention of water in, over, or through the structure. The easement is simply permissive and does not require the defendants to construct, operate, maintain, or inspect the structure.

In reaching this conclusion, the court noted that other sections of the contract used the word "shall" but the section in question did not. We agree with the district court that, as written, the easement allows the defendants access to the Sunbergs' property for a number of actions involving the structure; it does not require the defendants to undertake any specific action.

Moreover, even if we found the defendants did have a contractual duty to maintain the structure, we would find that the word "maintain" was ambiguous and would thus look to extrinsic evidence to define the term. *See Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) ("Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract 'can almost never be plain except in context.'" (citation omitted)). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Id.* The Sunbergs' argument that the defendants breached their duty to them is premised upon the fact that the pond was allowed to silt in, becoming an unpleasant boggy area. But both the Sunbergs' and the defendants' expert testified that structure 28-3 was constructed with the intent to hold a total of 86.9 acre feet of sediment behind the dam. Additionally, both experts opined that

amount of sediment had not yet been reached. The Sunbergs' expert testified that the culverts, the reservoir (the former pond area), the riser, the draw-down tubes, the emergency spillway, and the dam structure were all still functioning properly. He also agreed "that flood control is still as originally intended, and it hasn't been impacted yet." He maintained that if silt was allowed to continue to accumulate, at some point in the future, "it is going to reduce the flood control function." And while we acknowledge this statement about future issues, we note that the defendants' expert testified that structure 28-3 was built to be a fifty-year structure. In other words, it was designed with the expectation that the total amount of silt the reservoir could hold would be accumulated fifty years after construction was completed in 1975. The Sunbergs' expert testified he expected the pond or reservoir to be fully filled with sediment by 2020, while the defendants' expert opined it would occur in 2025—when the structure will be approximately fifty years old. Perhaps most importantly, the Sunbergs' expert testified that the extensive work proposed to recreate the pond area would not provide any additional life span for the flood detention or flood-storage capacity of structure 28-3.

Even if the defendants had a duty to maintain structure 28-3, we cannot interpret the term "maintain" to include the prevention or removal of silt accumulation. The structure was designed to hold the silt and, according to both experts, is still functioning as intended.

## IV. Conclusion.

The defendants have neither a statutory, common law, nor contractual duty to maintain structure 28-3. Even if they did have a contractual duty to maintain the structure, that duty would not require them to remove accumulated silt or take

action to reduce the rate the silt would accumulate, as the structure was designed to accumulate silt and is functioning properly. We affirm the district court's dismissal of the Sunbergs' lawsuit.

**AFFIRMED.**